THE DEACONESS HOME AND HOSPITAL

*v.*

AMELIA BONTJES.

*Opinion filed February 17, 1904.*

1. INJUNCTION—*when carrying on of hospital will be enjoined without a verdict declaring it a nuisance.* The carrying on of a hospital in proximity to complainant's dwelling may be enjoined as a private nuisance without a judgment at law, where the evidence is clear and certain that the hospital, as conducted, injures the health of complainant's family and destroys their peace and comfort.

2. SAME—*when the relief granted sufficiently corresponds to the relief prayed.* If the relief granted on a bill for injunction is within the prayer of the bill and not inconsistent therewith, the fact that it is not so extensive as the relief prayed does not defeat the decree.

3. HOSPITALS—*hospital must not be so conducted as to be a nuisance.* A hospital must not be conducted in such a manner as to be a nuisance to adjoining property owners who are in nowise responsible for its location and operation.

*Deaconess Home and Hospital* v. *Bontjes*, 104 Ill. App. 484, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Peoria county; the Hon. L. D. PUTERBAUGH, Judge, presiding.

"Mrs. Emelia Bontjes, a widow, bought a half lot, fifty feet wide and three hundred and twenty-three feet deep, upon a bluff in a residence district in the city of Peoria, at a cost of over $5000, and in 1894 built thereon a dwelling house, which she has ever since occupied as her home. She also built a barn. She expended about $13,000 in improvements. Her family consists of herself, her daughter, her daughter's husband and their little child. When she bought this tract and built her house thereon, the lot next east, one hundred feet wide, had upon it a brick house, designed for and occupied by a private family. Its main rooms and most of its windows faced west. Mrs. Bontjes built her house with the rooms and windows mainly on the east side. Thus the living

apartments and most of the windows of the two houses face each other.   There is a space of thirty or thirty-five feet between the two houses, two or three feet of which is owned by Mrs. Bontjes and the rest is part of the lot on which the brick house stands.   Next to the brick house is a walk by which to pass between the front and rear of those premises, and between that walk and Mrs. Bontjes' lot line is a driveway for teams and carriages, used in connection with the brick house and the only means of access to the brick house for conveyances.   The front of each lot is occupied by a terraced slope to the street, which is nearly one hundred feet below.   In October, 1898, a corporation was organized under the laws of this State, named 'The Deaconess Home and Hospital of the Central Illinois Conference,' having its office and principal place of business at Peoria.   Its purpose was declared to be 'to establish and maintain a Deaconess home and hospital in co-operation with the Methodist Episcopal Deaconess Society,' and 'to provide for and carry on all the varied religious, educational, humane and philanthropic work which may properly come within the province of such an organization, in accordance with the discipline of the Methodist Episcopal Church of the United States.'  In November, 1898, the society purchased the brick residence and the lot on which it stood, for $12,000, and established there a Deaconess home.   In the spring of 1900 it made some changes in the interior of the building, and on May 24, 1900, it opened there a hospital for the care and treatment of the sick and injured, which it has ever since maintained.   On November 1, 1900, Mrs. Bontjes filed a bill in the court below to enjoin the Deaconess Home from further carrying on and operating said home and hospital.   The facts which she claimed entitled her to that relief are set out at length in the bill.   The defendant answered, admitting some allegations and denying others.   The cause was referred to a master to take and report proofs, with his conclu-

sions of law and fact.   The proofs were taken from Jan-
uary to May, 1901.   The master's report was in favor of
complainant.   Defendant filed objections thereto, which
the master overruled.   The report was filed in court,
and defendant filed exceptions thereto.   The court did
not act directly upon these exceptions, but entered a de-
cree finding the facts in detail, ending with the conclu-
sion that defendant's hospital is a private nuisance and
ought to be abated; that the equities are with the com-
plainant, and she has no adequate remedy at law.   It
was decreed that defendant be permanently restrained
from carrying on or operating a hospital in the building
on defendant's said premises 'during the continuance of
the relative proximity of the complainant's said resi-
dence and the building of defendant heretofore used on
its said lot as a hospital, and of the present internal and
external construction of defendant's said building.'   This
is an appeal by defendant from said decree.

"From the time the hospital was opened till the testi-
mony was closed, the hospital had been run at substan-
tially its full capacity.   During the first ten months it
had one hundred and fifty to one hundred and sixty pa-
tients.   The barn back of the brick house was made an
annex to the hospital to increase its capacity.   From
complainant's living rooms, up-stairs and down, the op-
erations of the hospital were often visible day and night.
What was said in the operating room during an operation
in summer time, when the windows were necessarily
open, was often heard in the bed-rooms in complain-
ant's house.   The inmates of complainant's house, look-
ing from its rooms, saw patients in the hospital entirely
nude and others partially disrobed while surgical and
other operations were being performed upon them.   They
saw surgical instruments, naked human limbs held aloft
and a fountain syringe used upon patients.   They saw
the bedding changed under patients too ill to be removed
from the bed.   They heard moans and groans, and pa-

tients crying and vomiting. When surgical operations took place at night they were performed under a bunch of six electric lights, which made complainant's rooms opposite light enough to read by, unless the reflection was excluded by keeping the shades down, which was not practicable in warm weather, when ventilation made it necessary to keep complainant's windows open. Soiled and bloody bandages and other unsightly articles from the sick room were deposited in a receptacle in the back yard and afterwards taken out by a scavenger in such a way as to make the sight offensive. Whenever a patient died or recovered, the mattress, quilts and sheets, and the rubber cloth used on the patient's bed, were ventilated in the back yard near complainant's yard and in full view. As defendant's barn or annex was only fifty feet from the hospital proper, the space for such ventilation was limited. This airing of bedding was of daily occurrence. The odor of iodoform and other drugs from the hospital pervaded complainant's house, passing through the open windows in the summer time and through the cold air duct in the winter, this effect being afterwards obviated for the winter by taking in the cold air for the furnace from a different side of the house. Ambulances conveying sick patients or persons injured in accidents came in over the driveway at all hours of the day and night, passing close to complainant's living rooms and bed-rooms. Physicians were daily driving in over that driveway, hitching their horses there, and frequently driving away late at night or in the early hours of the morning, after attending patients and performing surgical operations. If it was warm weather, complainant's windows were necessarily open, and also the hospital windows, and the sounds connected with the receipt and handling of persons seriously hurt or very ill, both outside and also inside the hospital, would very often be heard in complainant's house. From time to time coffins were brought to the hospital and afterwards removed

with dead bodies in them. This was generally done at
night, in which case complainant and her family were
usually awakened by the noises and aware of the cause.
It has, however, been done several times during the meal
time, and the ambulance would be but a few feet from
complainant's dining room. Sometimes the dead patient
was not removed in a coffin, but on a litter, the form show-
ing through a cloth laid over the body. Patients who
had sufficiently recovered to take exercise were caused to
walk back and forth between the houses, attended and
supported by a nurse. In such cases sometimes the pa-
tient was wrapped in a blanket or the head was bandaged.
In very warm weather patients were brought out and
placed on the front porch or in the front yard, and placed
in easy chairs and hammocks. The nurses fanned the
patients and administered medicines to them, and took
their temperature, in the front yard. Women about to
be confined, and who had come to the hospital for con-
finement, sat upon the front porch in hot weather, clad
in loose garments. These uses by defendant of its front
yard and porch precluded complainant and her family
from using her adjoining front yard and porch, and espe-
cially were they debarred from entertaining their guests
and callers upon her front yard and porch. We have not
stated all the offensive details given in complainant's
proof, but only an outline thereof. Defendant's proof did
not overcome the case thus made. Two persons who
have at different times acted as superintendent of the
hospital testified they were unable to see how some of
those things could have occurred and that some others
must have arisen from disobedience of rules by attend-
ants, and officers of defendant expressed their desire to do
what they reasonably could to avoid giving offense, but
no substantial attempt was made to deny the main spe-
cific facts detailed in complainant's proof. The events
and incidents we have referred to greatly disturbed the
comfort and nerves and sleep of the inmates of complain-

ant's home, and she and her family were greatly annoyed and distressed in mind. Complainant was deprived of the ordinary use and enjoyment of her property. In the main these sights and sounds and smells were not abnormal, but were the usual and necessary accompaniments of a busy hospital, conducted with a view to the proper treatment of persons who are in great pain and distress."

The foregoing statement of the facts of this case appears in the opinion of the Appellate Court herein, and such statement has been adopted by us.

It further appears that typhoid fever and erysipelas were treated at this hospital, and the medical evidence was to the effect that these diseases were contagious and might be contracted in the Bontjes residence when the windows of the hospital were open and the wind was blowing from that direction. It further appears that both appellee and her daughter were made sick and nervous by the sights, sounds, odors and influences to which they were subjected by this institution; that neither was able to regain her health at home, but both were obliged to go elsewhere for several weeks to recover.

The Appellate Court affirmed the decree rendered on the circuit, and the case comes to this court by a further appeal.

SHEEN & MILLER, and WINSLOW EVANS, for appellant:

Findings of fact by the Appellate Court are not conclusive in chancery cases. *Henry* v. *Caruthers,* 196 Ill. 136.

The courts of equity leave the question of nuisances, and their damages, to courts of law, except where the injury is irreparable or permanent and results from a wrongful act. *Wahle* v. *Reinbach,* 76 Ill. 322; *Barrett* v. *Cemetery Ass.* 159 id. 391.

Where the nuisance is one *per se,* no adjudication at law is necessary preliminary to the jurisdiction by injunction. *Smith* v. *McDowell,* 148 Ill. 69.

Where not a nuisance *per se* the nuisance must be admitted or irreparable injury alleged and clearly proved. *Oswald* v. *Wolf*, 129 Ill. 200.

The injury complained of must be permanent or continuous and such as cannot be prevented except by injunction. *Nelson* v. *Milligan*, 151 Ill. 467.

A nuisance may be both public and private, and depends on the propriety of place and manner of operation. *Wylie* v. *Elwood*, 134 Ill. 287.

The use of property, to be a nuisance, must be unwarrantable, unreasonable or unlawful, and result in injury to another. *Powder Co.* v. *Tearney*, 131 Ill. 326.

The relief prayed and that granted do not correspond, and must do so to be valid. *Dorn* v. *Gueder*, 171 Ill. 362.

The city has power to abate a nuisance if it exists, and to do all acts required to protect the complainant. Rev. Stat. chap. 24, pars. 76-79.

Relief by injunction will be denied where it is doubtful if the injury complained of will be permanent. *Robb* v. *LaGrange*, 158 Ill. 21.

JAMES A. CAMERON, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The first assignment of error to which our attention is called is that the relief granted does not correspond with the relief prayed in the bill. The prayer is, that the defendant be "restrained and enjoined from further operating and carrying on said home and hospital." By the decree it is permanently restrained from carrying on and operating a hospital in the building which it now occupies "during the continuance of the relative proximity of the complainant's said residence and the building of the defendant heretofore used  *  *  *  as a hospital, and of the present internal and external construction of the defendant's said building." The relief granted is not as extensive as that prayed, but is not inconsistent there-

with, and that granted is within the prayer of the bill, and the decree is therefore sustained by the bill.

It is then urged that as the hospital is not a nuisance *per se*, its operation cannot be enjoined until there has first been a determination by the verdict of a jury in an action at law that it is a nuisance.

From the evidence in this case it is clear and certain that the hospital conducted by appellant is a private nuisance. It not only destroys the peace, quiet and comfort of those living in the residence of appellee, but likewise seriously and injuriously affects their health, and occasions irreparable injury within' the meaning of the law. Under these circumstances equity will interfere by injunction, without waiting for a determination of the question of the existence of the nuisance in an action at law. (*Wahle* v. *Reinbach,* 76 Ill. 322; *Dierks* v. *Commissioners of Highways,* 142 id. 197.) If there is such contrariety of evidence that there remains a substantial doubt whether a nuisance exists, the question should first be determined in a suit at law. (*Oswald* v. *Wolf,* 129 Ill. 200.) In this case, however, there is no evidence which tends to show that a nuisance does not exist. The most that can be said for the evidence offered by appellant is, that it indicates that the wrong is not of so serious a character as complainant charges, and that it may be lessened somewhat by certain precautions which appellant is willing to use hereafter. The proposed measures would not result in an entire removal of the nuisance. It is said that a screen may be erected between the two properties, and that the windows of the hospital may be kept closed and the curtains drawn on the side next the property of appellee. It is manifest that in the summer time the windows must be opened and the curtains drawn aside in both buildings for ventilation, and it is equally apparent that the screen would not prevent the cries of the suffering, the moans of the dying and other offensive noises being heard in the home of the appellee; nor would such

an obstruction entirely prevent the transmission of the smell of iodoform, ether and other offensive substances; nor would the annoyance resulting from the frequent .visits of the hearse and the ambulance to the hospital be materially lessened by the proposed precautions.

The work in which appellant is engaged is philanthropy of the highest order, but the law will not permit it to be conducted in such a manner that it becomes an intolerable nuisance to those who are in nowise responsible for its location and operation.

The statement is made that appellee had the power in her own hands, by mere request to those who were operating the hospital, to prevent the injury complained of, and it is insisted that she failed to speak when fairness and good conscience required her to make her objections known to the hospital authorities, and that she is therefore estopped to now seek the aid of a court of equity.   Without stopping to consider at all this proposition of law, it is sufficient to say that the argument is based upon a misapprehension of the evidence.   Prior to the establishment of the hospital appellee objected to its location in the building in question.   She made these objections known to persons who were raising money by subscription to set the hospital on its feet, and offered a donation if it was located elsewhere.   From the testimony of Mr. Walter Wyatt, secretary of the board of trustees of appellant, it appears that complaint was made to him by Cameron, the attorney for appellee, prior to the beginning of this suit, of the manner in which the institution was conducted.   Wyatt, in substance, invited this litigation by stating to the attorney that he saw no way out of the matter except to bring suit.   Wyatt, however, reported the complaint to the trustees, who took no action except to direct the superintendent to conduct the hospital in such a manner that there would be no complaint from any one.   This direction bore no practical fruit.

207—26

The trustees testified that they did not know that the hospital was being conducted in a manner so offensive to those in the home of appellee; that had they known of the condition of affairs they would have minimized the evil as far as possible. This is no answer to the complaint. They were responsible for the management of the institution, and it was their duty to see that it was conducted in such a manner that the lawful rights of others were not infringed.

From the evidence before us, this difficulty seems to come about from the fact that the grounds occupied by appellant are wholly inadequate in extent for the operation of a hospital of the character there conducted.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*