THE MAYOR AND COUNCIL OF WILMINGTON, a Municipal Corporation of the State of Delaware,

*vs.*

ETTA H. TURK.

## *New Castle, May 27, 1925.*

Residence, wherein trained nurse takes private patients having adenoids and diseased tonsils, and maternity cases, with a room fitted up in which minor operations thereby necessitated may be performed, *held* "hospital" within zoning ordinance, enacted pursuant to 33 *Delaware Laws, c.* 114, prohibiting maintenance of hospitals in Residence "A" Districts.

Police power may be exercised in interest of public peace, good order, safety, health and morals, notwithstanding it impinges on rights vouchsafed by literal language of constitutional provisions designed for protection of citizens in use and enjoyment of property.

Though the judgment of Legislature on question of necessity of extending police power to any given subject is to be accorded benefit of favorable presumption, courts are not excluded from a review of legislative action in the premises.

Hospitals are not nuisances *per se*, though they may become so by reason of careless management, or by reason of type and character of persons received and proximity of other persons residing in neighborhood.

The exclusion from a residential district of a private hospital, maintained by a trained nurse in her private residence, which to all outward appearances is a residence, and in no sense a nuisance or offensive or annoying to any one, cannot be upheld as a valid exercise of police power.

Aesthetic considerations alone, and desire to preserve a residential district exclusively for residence purposes, is not such a promotion of general welfare as to warrant exclusion from residential district of a private hospital, maintained in a private residence, in an unobjectionable and inoffensive manner.

The enjoyment of a property consists, not alone in holding legal title thereto, but includes control and use thereof, and, if a zoning ordinance unwarrantably deprives one of legitimate use of property, he may appeal to constitutional safeguards as fully as if title itself were proposed to be taken.

It is common knowledge that stores are found in great abundance in thickly populated communities.

The mere fact that a zoning ordinance is comprehensive rather than par-

tial, does not warrant exclusion of businesses, or render things permissible which would not be valid or permissible in case of partial zoning.

Injunction Bill to restrain the defendant from a threatened violation of the so-called Zoning Ordinance of the City of Wilmington. The ordinance was adopted by the city in pursuance of authority conferred upon cities and incorporated towns by *Chapter* 114, *Volume* 33, *Laws of Delaware*, approved March 14, 1923. *Sections* 1, 2 and 3 of this act disclose its purpose, and the extent of powers conferred.   Said sections are as follows:

"*Section* 1.   *Grant of Power:*—For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of cities and incorporated towns is hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes.

"*Section* 2.   *Districts:*—For any or all of said purposes such legislative body may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this act;  and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures, or land.  All such regulations shall be uniform for each class or kind of buildings throughout each district but the regulations in one district may differ from those in other districts.

"*Section* 3.   *Purposes in View:*—Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets;  to secure safety from fire, panic and other dangers;  to promote health and the general welfare;  to provide adequate light and air, to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements.  Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality."

The ordinance passed in pursuance of the authority conferred by the act is a comprehensive one.   It divides the city into nine districts and by an elaborate system of regulations and prohibitions undertakes to impose restrictions upon property holders

within the city touching the particulars with respect to which power is conferred by *Section* 1 of the act above quoted.

The property with which the bill concerns itself is known as No. 615 West Eighteenth Street in the City of Wilmington. It is located in what is defined by the ordinance as a Residence "A" District. The defendant is not the owner of this property, nor is she the present occupant thereof. She is a registered nurse, more familiarly known as a trained nurse. At present she resides at No. 1908 Jefferson Street in said city with her husband and daughter. At her house she pursues her calling as a nurse by taking private patients. The sort of cases which she has received are adenoid and diseased tonsil cases (one hundred and forty during the year 1924), maternity cases (twenty-five during the same year), after care, or post-operative cases resulting from major operations performed in a general hospital (two during the same year), and cases requiring care on account of age or other infirmities (two during the same year). In her home she has fitted up a small aseptic room in which minor operations necessitated by the type of cases she receives may be performed. The nursing attention required for the tonsil and adenoid cases averages from one to three days. The few other cases require a longer period of nursing. Ether or some other anæsthetic is of course supplied by her in the handling of the cases which necessitate an operation. No major operations are performed in her house, nor are persons suffering from infectious or contagious diseases received by her. Her business is a private one; the facilities she offers are not extended to the public generally, but are the subject of special arrangement made by a few physicians. Whenever the necessity arises, she employs an outside nurse to come in and render assistance.

The foregoing description of the sort of service she renders at her present home is mentioned because the answer and testimony show that she plans to render an exactly similar service at her proposed future home, No. 615 West Eighteenth Street, in case she acquires title to the same under the terms of a contract of purchase which she has heretofore entered into. The only difference between the business to be conducted by her at the new place and that conducted by her at her present home, is that

the former will, by affording more room, supply accommodations for a larger number of patients if she should be so fortunate as to be able to secure more. There will be no institutional marks on her new home, No. 615 West Eighteenth Street, as there are none on her present home. A simple metal plate bearing her name with the letters "R. N." will be the only thing in the way of an advertisement on the building. The house already constructed at 615 West Eighteenth Street is a residence and will, if the defendant acquires it, continue to present a residential appearance.

The bill charges that the business proposed to be conducted by the defendant at 615 West Eighteenth Street will make of the place a hospital, that a hospital is prohibited by the ordinance in Resident "A" Districts, and prays an injunction restraining the defendant from using said premises for such purpose.

The defendant (1) denies that she proposes to conduct a "hospital" as the term is to be properly understood; (2) contends that the ordinance permits the "office of a physician or similar professional person, residing on the premises" to be maintained in Residence "A" Districts, "provided there be no advertising other than by an identification sign placed in or on the dwelling," and that she, being a "similar professional person," comes within the permission; (3) avers that "customary home occupations such as dressmaking or millinery conducted by a resident occupant with the assistance of not more than an average of two employees" are likewise permitted by the ordinance in Residence "A" Districts, and that she falls within this permissive category; and (4) if the foregoing be rejected as without merit, the defendant contends that the ordinance as applied to her under the facts of this case is unconstitutional.

The case was heard on bill, answer, testimony of witnesses heard orally by the Chancellor and exhibits.

*Caleb S. Layton*, City Solicitor, for the complainant.

*Herbert H. Ward*, of the firm of Ward, Gray and Ward, for the defendant.

THE CHANCELLOR. The ordinance, following the authority of the statute, deals with four general subjects for regulation and

prohibition, viz., (a) the use of buildings, (b) the height and size of buildings, (c) areas and dimensions of open spaces and building lots, and (d) density of population. In the instant case we are concerned only with that portion of the ordinance which deals with (a).

*Section* 8 of the statute provides remedies available to municipal officers for the enforcement of the zoning ordinances authorized by it. Said section is as follows:

"*Section* 8. *Remedies:*—In case any building or structure is erected, constructed, reconstructed, altered, repaired, converted, or maintained; or any building, structure or land is used in violation of this act or of any ordinance or other regulation made under authority conferred thereby, the proper local authorities of the municipality, in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance or use to restrain, correct or abate such violation, to prevent the occupancy of said building, structure or land or to prevent any illegal act, conduct, business or use in or about such premises."

Inasmuch as we are here dealing with the question of the use of a building, it would seem that the clause in the foregoing section authorizing preventive process is the one which specifies the case of a building "used in violation of this act or of any ordinance." The defendant is not in possession of the building in question, nor is she its owner. It is not being "used" in violation of the statute, nor of any ordinance, nor of any regulation. What right has the city, therefore, to now seek injunctive relief in this court?

The parties have chosen to ignore this question. I ought perhaps to answer it myself and, if the conclusion should be that the bill is prematurely filed, decree a dismissal. An outcome based on such a reason, however, would probably serve only to defer to a later time a decision on the substantive points; and I shall, therefore, proceed to consider the case in the light of the contentions as they were shaped by the solicitors at the argument and on their briefs.

Throughout this opinion it will be assumed that the defendant's business which she proposes to conduct at No. 615 West Eighteenth Street will be the same as she now conducts at her present home, an assumption upon which solicitors for both parties to the cause have based their respective contentions.

First. Is the defendant's place of business properly embraced within the meaning of the term "hospital" as the same is used in the ordinance? The argument which the defendant makes under this head is, that the clause of the ordinance which banishes hospitals from Residence "A" Districts groups them with "charitable institutions, sanitariums or municipal firehouses"; that the contextual associates of "hospitals" are all things having what the solicitor for the defendant calls an institutional nature, and that such a place as the defendant's hospital, if it be such, having no institutional badges or features and being private, cannot have been meant to be covered by the ordinance. An examination of the brief of the solicitor for the defendant leaves the mind in doubt as to the precise idea he means to convey by the words "institution" and "institutional nature." If, as I gather, it is meant that only those hospitals which are public and charitable in nature are intended to be described by the ordinance, then private hospitals however elaborate and extensive they may be would not be excluded from Residence "A" Districts. Private hospitals are well known to exist throughout the country in great numbers. It is difficult to believe that the legislative body of the city intended to base its banning of hospitals upon the somewhat irrelevant circumstance of how and by whom they are supported, whether by private funds or by public and charitable donations. If hospitals are the proper subject for hostile legislation, the nature and character of their organization, operation and support cannot serve to make them less so. In the named category of things in which hospitals are included, we find sanitariums. Now, sanitariums are generally privately conducted and supported. If so, it is apparent that the ordinance within itself negatives the idea that it was intended by the City Council that only institutions of a public and charitable nature were intended to be embraced within the category of things in which hospitals find themselves listed. If the defendant's place of business, notwithstanding she resides there, is a hospital in the ordinary meaning of the term, it falls within the general scope of the term as used in the ordinance.

Is it, then, a hospital? The Century Dictionary defines a hospital as "an establishment or institution for the care of the sick or wounded, or of such as require medical or surgical treat-

ment." It is unnecessary to quote from other dictionaries of accepted authority for definitions of like import. It is very clear that Mrs. Turk's residence is a hospital in the general acceptation of the term and as conducted by her constitutes a non-conforming use as defined by the ordinance.

Second and Third. These contentions are that the defendant is excepted from the operation of the ordinance's prohibition because (a) her place of business is the office not of a physician, to be sure, but nevertheless of "a similar professional person residing on the premises," and (b) that her business is, in the language of the ordinance, a "customary home occupation such as dressmaking or millinery conducted by a resident occupant with the assistance of not more than an average of two employees." Whether the defendant in the conduct of her profession can be said to have an office similar to that of a physician, and whether she can be said to be engaged in a customary home occupation such as dressmaking and millinery, I need not pause to consider. This is for the reason that the ordinance specifically permits hospitals in districts other than Residence "A" Districts, and it would be a torturing of logical interpretation to assume that the legislative authority of the city meant by the use of general language of uncertain extent to permit something in Residence "A" Districts which it had by special mention allocated to other districts. The conclusion is that the ordinance assumes to prohibit the defendant from conducting her hospital at 615 West Eighteenth Street, which is located within a Residence "A" District.

Fourth. The contention made under this head raises the most difficult as well as the most interesting question in the case. Is the ordinance as applied to the defendant a constitutional exercise of authority? If valid, it must rest upon the police power of the State for its support. The extent and scope of that power is incapable of definition. That it may, notwithstanding it impinges upon rights vouchsafed by the literal language of constitutional provisions designed for the protection of the citizen in the use and enjoyment of his property, be exercised in the interest of the public peace, good order, safety, health and morals, has been repeatedly decided by the courts; and uncompensated loss or damage to the property owner occasioned by the legitimate exercise of the power

is an incident thereto which, though regretable, must nevertheless
be endured as one of the conditions with which the right of property
is burdened. No court has ventured to explore the extent of this
power. It is a power which rests upon no express constitutional
grant. It is a power evolved by judicial decision and is rooted in
the conception that men in organizing the State and imposing up-
on their creature limitations for the protection of the citizen, did
not intend thereby to secure to the individual citizen a right to
obstruct the State in the pursuit of such salutary measures of con-
trol as are reasonably calculated to protect society generally in
its peace, good order, safety, health and morals. Notwithstanding,
therefore, that our own Constitution in its Bill of Rights declares
that no person shall be deprived of his property "unless by the
judgment of his peers or by the law of the land" and the Constitu-
tion of the United States in its Fourteenth Amendment declares .
that no state shall "deprive any person of life, liberty or property,
without due process of law," the police power, if its purpose is to
secure any of the objects lying within the purview of its legitimate
scope, is not hampered in the restraints it imposes by the literal
and precise guarantee afforded by these constitutional provisions.

That the police power may be exercised in the interest of the
public health, safety and morals, is well settled. There is no court
anywhere that does not recognize these as among the accepted
objects of the legitimate concern of the State's police power. In
describing the power, however, courts have not confined their
language to this narrow list of the power's permissible objects.
The Supreme Court of the United States in *Bacon v. Walker*, 204
*U. S.* 318, 27 *Sup. Ct.* 289, 51 *L. Ed.* 499, and in *Noble State Bank v.
Haskell*, 219 *U. S.* 104, 31 *Sup. Ct.* 186, 55 *L. Ed.* 112, 32 *L. R. A.*
(*N. S.*) 1062, *Ann. Cas.* 1912A, 487, gave expression to as broad
language as may perhaps be found in any of the adjudicated
cases in describing the purposes which the police power may be
employed to subserve. In the former case, which involved the
power of the State of Idaho to prohibit the grazing of sheep on the
public land within two miles of any dwelling, the court said:

"It (the police power) is not confined * * * to the suppression of
what is offensive, disorderly or unsanitary. It extends to so dealing with

the conditions which exist in the State as to bring out of them the greatest welfare of its people."

In the latter case (*Bank v. Haskell*) in which the right of the State to compel payment of an assessment under the act providing for a State guaranty of bank deposits was called in question, the Supreme Court said:

"It may be said in a general way that the police power extends to all the great public needs."

Our own Supreme Court has used language which, though broad, is not quite so sweeping as the foregoing. In *Van Winkle v. State*, 4 *Boyce*, 578, 91 *Atl.* 385, *Ann. Cas.* 1916D, 104, it observed that the police power—

"extends to such restraints and regulations as are reasonable and proper to protect the lives, health, comfort and property of its citizens and to promote the order, morals, safety and welfare of society."

Such broad generalizations as these, if given too generous acceptance, could, under the manipulation of shrewd and clever reasoners, be made to draw within the grasp of the police power subjects for regulation and prohibition to which it is difficult to believe any court would give sanction. The significance of such broad generalizations is to be gathered, therefore, not so much from the general import of the language in which they are couched as from the facts of the particular case to which they are applied.

In *Bacon v. Walker, supra,* for instance, it appears that the prohibited grazing was on public land which was a common pasture for all the people, similar in principle to the tapping by an oil driller of a common reservoir; that sheep in their grazing are destructive and monopolistic; that frequent conflicts occur between sheep herders on the one hand and cattlemen and settlers on the other. It was therefore in the interest of all to keep sheep herders two miles distant from dwellings as the statute undertook to do. This was the sort of "greatest welfare" that the police power was permitted to serve in that case. "Greatest welfare" in that case might in the last analysis be said to consist simply in a desire to promote the public peace and regulate the use of common public property. And in *Bank v. Haskell, supra,* the "greatest public

needs" which it is said the police power may subserve will upon examination be found to have consisted in the conception that the State could exact of banking institutions of its own creation as a condition for doing business, that contributions should be made to a fund for the purpose of making it safe for depositors to deposit their moneys and of giving security to business. In principle I suppose usury statutes rest on the same sort of conception. And the very broad language of our own Supreme Court in *Van Winkle v. State, supra*, when applied to the statute under review (a statute dealing with the transportation of liquor into local option districts) will upon final analysis be found to amount to this—that the police power may be exercised to promote the peace, health and morals of the people and that the regulation, prohibition and shipment of intoxicating liquors are reasonably related to that end.

The nature of the police power is such as to defy exact definition and this accounts for the generality of expression of judges in their attempts to describe it. When we say that the power may be exercised to promote the "public welfare," it is apparent that a field of exceedingly wide extent is opened for its occupancy. How far this field may be entered upon is a perplexing problem with which courts are required constantly to struggle. That there is danger of unduly extending the dimensions of this phrase "public welfare," is recognized by the Justices of the Massachusetts courts, who have said that the public welfare "when defined with some strictness so as not to include mere expediency" has been held some ground for the exercise of the police power. *Com. v. Strauss*, 191 *Mass.* 545, 78 *N. E.* 136, 11 *L. R. A.* (*N. S.*) 968, 6 *Ann. Cas.* 842; *Brett v. Building Com'rs.*, (*Mass.*) 145 *N. E.* 269. The value to be attached to this expression of the Massachusetts courts is not in any definiteness with which the metes and bounds of the phrase "public welfare" are prescribed; it is rather in the recognition that the phrase is in danger of carrying too much with it and needs to be somewhat confined. Whatever the expression, whether it be "comfort and welfare," "general welfare," "comfort and welfare of society," "greatest welfare of the people," "great public needs," or any other like expression, I take it that some such caution as is indicated by the Massachusetts courts is to be exercised against allowing the general import of the phrase too free a scope.

"Public welfare" and similar phrases are comprehensive expressions. Within them are undoubtedly embraced the health, peace, morals and safety of the community. What beyond these features of social welfare the general phrase in its relation to the police power may include, is to be determined from the decided cases in the light of each one's facts and, when new facts arise, from the processes of reason which the judicial mind brings to bear on the question. After all, in many instances at least, this judicial function is so involved with the individual sociological views of the judges as to make it difficult to distinguish the relative contribution which reason on the one hand and social views on the other make to the blended result. This perhaps accounts for the expanding development of the power in such degree as to keep it reasonably abreast of the growing conceptions of the public, for it is doubtless true that as new social ideas find considerable acceptance among the people they will in due course reflect themselves in the subconscious social points of view of judges and thus result in an enlargement of the subjects amenable to the power's regulations.

That the judgment of the Legislature is to be accorded the benefit of a favorable presumption upon the question of the necessity of extending the power to any given subject is not to be doubted. This does not mean, however, that courts are to be excluded from a review of the legislative action in the premises. The Supreme Court of Wisconsin in *State v. Harper*, 182 *Wis*. 148, 196 *N. W*. 451, 33 *A. L. R*. 269, cited by the complainant, correctly expresses the rule on this point in the following excerpt:

"Those cases establish the principle that whether a given situation presents a legitimate field for the exercise of the police power placing restraints upon the use of property or upon personal conduct depends upon whether the situation presents a reasonable necessity for the imposition of restraint in order to promote the public welfare, and whether the means adopted bear a reasonable relation to the end sought to be accomplished. * * * Given a subject in respect to which there is some reasonable necessity for regulation, fair doubt in respect thereto being resolved in favor of the affirmative, in case of the Legislature having so determined, the degree of exigency is a matter wholly for its cognizance. What is said as regards the legitimacy of subjects for exercise of the police power may be repeated as to appropriateness of means; while given the two elements—legitimacy of subject and appropriateness of means—the degree of interference within the boundaries of reason is for the

Legislature to decide, there being left in the end the judicial power to deter-
mine whether the interference goes so far as to violate some guaranteed rights,
regulate it so severely as to materially impair it, reasonable doubts being re-
solved in favor of legislative discretion."

In the instant case we are called upon to consider whether in
the matter of zoning towns and cities there is such legitimacy of
subject and such appropriateness of means employed as to warrant
a restriction upon the use of property such as the ordinance in
its application to the defendant assumes to impose.

The State by the act referred to in the statement of facts
clearly undertook to confer upon the city authority to enact an or-
dinance of the kind we are here concerned with. There is no ques-
tion therefore concerning the existence of a delegated authority
from the State. The act is general and leaves to the towns and
cities the right to prescribe the details of its application.

The business of the defendant is in no sense a nuisance.
The evidence shows it to be in no wise offensive. It is a hospital.
Hospitals are not however nuisances *per se*; they may become so
by reason of careless management (13 *R. C. L.* 951), and also
doubtless by reason of the type and character of patients received
and the proximity of other persons residing in the neighborhood.
Under the evidence in this case, however, it must be taken as true
that the defendant's hospital is of such kind and character and is
so conducted as not in the least manner to be an offense or an-
noyance of any kind to any one. While it is proper to speak of her
residence as a hospital, yet in its outward features it presents the
appearance of a residence. The building itself was constructed as
a residence, is now used as such and will continue to be used as
such, the defendant and her family residing there. If aesthetic
considerations were allowed as permissible to be promoted by the
police power, which as hereinafter observed they are not, it would
still be true that, so far as all outward aspects could disclose, the
defendant's proposed home and hospital would present the ap-
pearance of being a residence building in harmony with the residen-
tial character of the neighborhood. The types of cases which she
receives are such as to obviate all possible appearance of those dis-
tinguishing characteristics which usually adhere to a hospital and
the evidence shows that in no way does her business disturb or

occasion discomfort to the neighboring residents. In this respect
the instant case is distinguishable from *Stotler v. Rochelle, et al.,*
83 *Kan.* 86, 109 *Pac.* 788, 29 *L. R. A.* (*N. S.*) 49, *Shepard, et al., v.
City of Seattle,* 59 *Wash.* 363, 109 *Pac.* 1067, 40 *L. R. A.* (*N. S.*)
647, and *Deaconess Hospital v. Bontjes,* 207 *Ill.* 553, 69 *N. E.* 748,
64 *L. R. A.* 215, where it was held proper for the city to prohibit
the maintenance of hospitals of the type there involved. Nor are
those hospital cases referred to by the complainant such as *Law-
rence v. Nissen,* 173 *N. C.* 359, 91 *S. E.* 1036, of significance here
because in them the question was one not of prohibition but of
regulation.

The complainant cites a great many cases upon the right of
legislative bodies to prohibit the use of property for sundry business
purposes in the residential portions of cities. Most of these cases,
I do not regard as in point here. Most of them present cases of
nuisances or *quasi* nuisances and, when their facts are studied,
appear to be held by the courts to fall within such well recognized
and perfectly legitimate objects of public regulation as the health,
safety and morals of the community. The broad, general language
found in them is thus upon analysis found to be uttered with re-
spect to those particular aspects of public welfare and needs which
are everywhere accepted as appropriate objects of the police
power's concern.

The brief review of these cases which follows will show this to
be so. *Barbier v. Connolly,* 113 *U. S.* 27, 5 *Sup. Ct.* 357, 28 *L. Ed.*
923, and *Ex parte Quong Wo,* 161 *Cal.* 220, 118 *Pac.* 714, which
dealt with the laundry business, rest on the power of the State to
protect the public health and safeguard against fire. In what ap-
pears to be a hard case, *Hadacheck v. Los Angeles,* 239 *U. S.* 394, 36
*Sup. Ct.* 143, 60 *L. Ed.* 348, *Ann. Cas.* 1917B, 927, it was held that
certain businesses which are not nuisances *per se* might be declared
to be such in fact and in law. The appellant's brickyard was held
to be such a business. The city in its answer and supporting af-
fidavits charged that the brickyard in question emitted fumes,
gases, etc., which caused sickness and discomfort, and the Sup-
preme Court, not having the facts before it, refused to reject the
presumption in favor of the correctness of the State court's judg-
ment. The case of *Reinman v. Little Rock,* reported in 237 *U. S.*

171, 35 *Sup. Ct.* 511, 59 *L. Ed.* 900, was the case of a livery stable and
the Supreme Court assumed that the State court had accepted as
true the averments to the effect that the stable was conducted in a
careless manner in the midst of a great shopping and hotel district
of the city, that droves of horses and mules were driven to the
stable through the streets, that offensive odors annoyed the shop-
pers and nearby tenants and that the stables caused disease and
made the section unwholesome.  The power here rested on con-
siderations of a nuisance nature.  *Cusack v. Chicago*, 242 *U. S.*
526, 37 *Sup. Ct.* 190, 61 *L. Ed.* 472, *L. R. A.* 1918A, 136, *Ann. Cas.* ·
1917C, 594, and *St. Louis Poster, etc., Co. v. St. Louis*, 249 *U. S.*
269, 39 *Sup. Ct.* 274, 63 *L. Ed.* 599, were billboard cases and the city's
power to prohibit and regulate was based on consideration of the
safety, morality, health and decency of the community.  In the
second of these two cases the court indicated that a portion of the
ordinance in review was probably partly inspired by a desire to
serve the aesthetic and, if this were the only consideration underly-
ing it, that portion could not be upheld.  I hesitate to suggest that
the reasoning which connects billboards with morals, health and
decency (in the absence of improper advertisement) might be
strained.  If it is, the cases simply illustrate how loath the Su-
preme Court was to allow itself to get outside of rather well de-
fined paths into the field of aesthetic and artistic considerations and
matters of taste, which are without any fairly definite yardstick
commonly accepted for their measurement.  *State v. Hyman*, 98
*Md.* 596, 57 *Atl.* 6, 64 *L. R. A.* 637, 1 *Ann. Cas.* 742, recognizes the
propriety of regulating sweatshops as being in the furtherance and
protection of public health.  In *Osborn v. Shreveport*, 143 *La.* 932,
79 *So.* 542, 3 *A. L. R.* 955, *Brown v. Los Angeles*, 183 *Cal.* 783, 192
*Pac.* 716, and the unreported case of *Memphis v. Spencer-Sturla
Co.*, in the Circuit Court of Shelby County, Tennessee, the pro-
hibition of undertaking establishments within residential districts
was recognized as a legitimate subject for police power legislation.
The Louisiana court emphasized the offensiveness of that business
occasioned by odors from dead bodies and embalming fluids and
the depressive effect of the constant reminders of death from
hearses, etc.  *Myers v. Fortunato*, 12 *Del. Ch.* 374, 110 *Atl.* 847,
*Osborne v. Grauel*, 136 *Md.* 88, 110 *Atl.* 199, *People v. Oak Park,*

266 *Ill.* 365, 107 *N. E.* 636, and *Schait v. Building Inspector*, 97 *N. J. Law*, 390, 117 *Atl.* 517, are garage cases and clearly rest upon a legitimate regard for the peace and comfort of a residential neighborhood. *Munn v. Illinois*, 94 *U. S.* 113, 24 *L. Ed.* 77, belongs to a class of cases with which we cannot here be concerned. It holds that private property devoted to a public use may be subject to regulation. In the case of *Des Moines v. Manhattan Oil Co.*, 193 *Iowa*, 1096, 184 *N. W.* 823, 188 *N. W.* 921, 23 *A. L.* R. 1322, the court in a lengthy opinion sustains an ordinance prohibiting oil and gasoline stations in a residence district. The court says that oil and gasoline are inflammable, offensive to the smell, and dirty in the street, that the places where they are sold cause automobiles to gather and wait, causing noise and disturbance. The facts of the case present an instance of a *quasi* nuisance, and it is similar in principle to the garage cases before noted. And so also it seems to me does the case of *Salt Lake v. Western Foundry & Stove Repair Works Co.*, 55 *Utah*, 447, 187 *Pac.* 829 (an iron foundry case), though the court in its opinion speaks generally of industrial establishments. Such cases as *Cochran v. Preston*, 108 *Md.* 220, 70 *Atl.* 113, 23 *L. R. A.* (*N. S.*) 1163, 129 *Am. St. Rep.* 432, 15 *Ann. Cas.* 1048, *Patterston, et al., v. Johnson*, 214 *Ill.* 481, 73 *N. E.* 761, and *Welch v. Swasey*, 193 *Mass.* 364, 79 *N. E.* 745, 23 *L. R. A.* (*N. S.*) 1160, 118 *Am. St. Rep.* 523, affirmed in 214 *U. S.* 91, 29 *Sup. Ct.* 567, 53 *L. Ed.* 923, fall within the well recognized right of the State to limit the height and structure of buildings under proper conditions in the interest of public safety and as a protection against fire.

The evidence before me showing the nature of the defendant's business, the manner in which it is conducted and the features which characterize it, is such as to make it impossible to believe either that its exclusion from the site in question is in any wise necessary to a promotion of any of the ends to which the police power was directed in the foregoing cases, or even reasonably connected or related thereto. A justification for the application of the ordinance to the defendant, if it exists, must be looked for upon some other consideration, and this can be no other than the following, viz., the desire to preserve a residential district exclusively for residential purposes and the few other permitted

uses which the ordinance evidently concedes not to be inharmonious therewith, and to exclude therefrom everything else no matter how devoid of annoyance or reasonable objection it may be. If the gratification of this desire can be said to constitute such a promotion of the general welfare as falls within the legitimate scope of the police power, then of course it follows that the incidental deprivation of the use of property which an owner thereby suffers cannot be avoided by him by an appeal to constitutional guarantees.

In answering the question of whether such a desire is within the legitimate scope of the police power's activity, the courts are not in accord. Before referring to the cases which deal with the constitutional right of cities to place a ban upon uses inoffensive in themselves to which property may be put solely for the purpose of preserving the exclusively residential character of prescribed districts, it should be said that no court, so far as my investigation discloses, has gone so far as to say that such a ban can be justified by aesthetic or artistic considerations. An individual may not relish the thought that an unsightly building is to be erected next to his dwelling, or that some use is to be made of the neighboring property which, though objectionable to his individual taste or fancy, is nevertheless otherwise harmless and inoffensive. Courts have said that where such is the situation, the owner of the supposedly offending property cannot be deprived of the right to use it in the manner suggested. If matters of taste are to be allowed to govern, to what standard shall uses be made to conform? Tastes vary and are as diversified as are personalities. Men have not yet become so standardized as to render obsolete the old maxim, *de gustibus non est disputandum*. Courts, therefore, have declined to recognize the right of the police power to interpose its tremendous strength against the enjoyment by the citizen of his constitutionally guaranteed right of property solely because of aesthetic or artistic considerations. The Supreme Court of the United States in the case before referred to has taken this view, and courts in the following cases have likewise done so: *Stubbs v. Scott*, 127 *Md*. 86, 95 *Atl*. 1060; *Spann v. Dallas*, 111 *Tex*. 350, 235 *S. W.* 513, 19 *A. L. R.* 1387; *State v. McKelvey*, 301 *Mo*. 1, 256 *S. W.* 474; *Isenbarth v. Barnett*, 206 *App. Div*. 546, 201 *N. Y. S.* 383; *People v. Chicago*, 261 *Ill*. 16, 103 *N. E.* 609, 49 *L. R. A.* )*N.*

S.) 438, *Ann. Cas.* 1915A, 292; *Passaic v. Patterson Posting &
Sign Co.,* 72 *N. J. Law,* 285, 62 *Atl.* 267, 111 *Am. St. Rep.* 676, 5
*Ann. Cas.* 995; *Haller Sign Works v. Physical Culture School,* 249
*Ill.* 436, 94 *N. E.* 920, 34 *L. R. A.* (*N. S.*) 998; *Byrne v. Maryland
Realty Co.,* 129 *Md.* 202, 98 *Atl.* 547, *L. R.A.* 1917A, 1216; *Quintini
v. Board of Aldermen,* 64 *Miss.* 483, 1 *So.* 625, 60 *Am. Rep.* 62;
*Com. v. Boston Advertising Co.,* 188 *Mass.* 348, 74 *N. E.* 601, 69
*L. R. A.* 817, 108 *Am. St. Rep.* 494; *Fruth v. Board of Affairs,* 75
*W. Va.* 456, 84 *S. E.* 105, *L. R. A.* 1915C, 981; *State v. Stahlman,*
81 *W. Va.* 335, 94 *S. E.* 497. *L. R. A.* 1918C, 77; *Varney & Green
v. Williams,* 155 *Cal.* 318, 100 *Pac.* 867, 21 *L. R. A.* (*N. S.*) 741, 132
*Am. St. Rep.* 88; *People v. Murphy,* 195 *N. Y.* 127, 88 *N. E.* 17,
21 *L. R. A.* (*N.S.*) 735. See also *Bayard v. Bancroft, et al., (Del. Ch.)*
62 *Atl.* 6.

In Massachusetts, I believe, views are expressed for the first
time which appear to give so-called aesthetic considerations a sort
of title to be favorably, though somewhat faintly, mentioned in
connection with the police power's exercise. These views are found
in *Welch v. Swasey,* 193 *Mass.* 364, 79 *N. E.* 745, 23 *L. R. A.* (*N. S.*)
1160, 118 *Am. St. Rep.* 523, and enlarged in *Opinion of the Justices,*
234 *Mass.* 597, 127 *N. E.* 525. It is worthy to note, however, that
the opinions in those cases adhere to the established rule which
rejects aesthetic considerations from the category of admitted
things which the police power may serve. The utmost extent of
their hint of a divergence from the settled rule is in the observation
that, "if the primary and substantive purpose of the legislation
is such as justifies the act, considerations of taste and beauty may
enter in, as auxiliary"—an observation which, it is apparent,
constitutes no divergence from the settled rule, and can amount
to nothing more than saying that if the police power is otherwise
properly exercised, the element of taste and beauty in connection
with the subject matter cannot serve to rob it of its vigor. In
*Ware v. Wichita,* 113 *Kan.* 153, 214 *Pac.* 99, this language of the
Massachusetts court is quoted, and there is an apparent inclination
on the part of that court to give to it a wider application than the
court uttering it intended. In other words, the Supreme Court of
Kansas rather strongly indicates its leaning in favor of according
recognition to aesthetic considerations. It will be observed, how-

ever, that it avoids a direct expression to that effect. Until the Supreme Court of this State rules to the contrary, or the overwhelming weight of authority elsewhere has been overthrown in those jurisdictions where it is now accepted, I feel impelled to recognize as the law of this State the rule that aesthetic considerations alone are an insufficient warrant for an exercise of the police power against a citizen who appeals to constitutional safeguards which assure to him the enjoyment of his property in all its legitimate uses.

The enjoyment of property does not consist alone in the holding of the legal title thereto. "There can be no conception of property aside from its control and use, and upon its use depends its value." *Ambler Realty Co. v. Euclid,* (*D. C.*) 297 *Fed.* 307. This is axiomatic. If the ordinance, therefore, unwarrantably deprives the defendant of a proper and legitimate use of her property, she may appeal to the constitutional safeguards as fully as if the title itself were proposed to be taken from her.

As before observed, the cases which deal with the subject of zoning are not in accord. The complainant cites cases in the jurisdictions of Massachusetts, Iowa, Kansas, Wisconsin, Louisiana, New York, Utah and Tennessee which it contends support the constitutionality of ordinances similar to the one here involved. On the other hand, the defendant relies on the authority of decisions in Maryland, Texas, Mississippi, Missouri, Illinois, California, New Jersey and Ohio (United States District Court) as hostile to the validity of the ordinance.

The earliest case in which the constitutionality of a comprehensive zoning ordinance appears to have been discussed is that of the *Opinion of the Justices,* 234 *Mass.* 597, 127 *N. E.* 525, decided in May 1920. While this case reports only an advisory opinion to the House of Representatives, yet it is expressive of the law in Massachusetts as appears from its approval in an opinion rendered in the subsequent case of *Building Inspector of Lowell v. Stoklosa,* decided by the Supreme Judicial Court in 1924, and reported in 145 N. E. 262. Notwithstanding the peculiar constitutional provision found in Massachusetts, this case appears to be authority directly in favor of the constitutionality of such comprehensive zoning ordinances as we are here concerned with. While the

*Opinion of the Justices, supra,* upholds the general constitutionality of such ordinances, yet it observes in one of the closing paragraphs that—

"It cannot be presumed in advance that municipalities will go outside their just powers and unwarrantably interfere with property. Cases of that sort must be dealt with if and when they arise."

There is thus a recognition of the fact that the application of the zoning principle is not left to the unrestrained will of the legislative body administering it. Later cases in Massachusetts deal with the special instances of application of the ordinance and they show that it is permissible to keep stores and two-family residences out of residence districts. *Spector v. Building Inspector,* (*Mass.*) 145 *N. E.* 265; *Brett v. Building Commissioner,* (*Mass.*) 145 *N. E.* 269.

The Massachusetts court, in sustaining the legislation in question as a valid exercise of the police power, kept strictly within the traditional views concerning the subjects of the police power's proper exercise. It reasons that the segregation of manufacturing, commercial and mercantile businesses in particular localities, bears a reasonable relation to the health and safety of the community. The "general welfare" which legislation of this character promotes is thus not left by the Massachusetts courts in the uncertain realm of debatable speculation upon what is publicly desirable in a general way, but is defined as consisting of those things which all courts everywhere have always recognized as the appropriate objects of the police power's concern. Whatever criticism may be made of the reasoning of the court by which it discovers a relation between the existence of a store or a two-family residence in a given neighborhood and the health and safety of the community, one cannot fail to note the studious adherence which the Masschusetts judges give to settled conceptions concerning the legitimate aims to which the State's reserved power over the private property of its citizens may be directed, viz., in the cited case, the health and safety of the public. Other courts have gone further than the Massachusetts courts in searching out a foundation of principles on which to rest the application of the power of zoning. They have not rested their rulings on considerations of health and safety as in Massachusetts. In the course of

their opinions they have given heed to such considerations as the preservation of property values, general municipal benefit and, as in the Kansas case above mentioned, probably to aesthetic sentiments. In the case of *State v. New Orleans*, 154 *La.* 271, 97 *So.* 440, 33 *A. L. R.* 260, may be found the most elaborate statement of the considerations which are said to justify the enactment of these zoning ordinances. The following quotation from that court contains about all the views which are found in whole or scattered in parts through the opinions in all the cases dealing favorably with legislation of this type:

"The attorneys for appellant have suggested several considerations that might well have prompted the enactment of the ordinances in question. In the first place, the exclusion of business establishments from residence districts might enable the municipal government to give better police protection. Patrolmen's beats are larger, and therefore fewer, in residence neighborhoods than in business neighborhoods. A place of business in a residence neighborhood furnishes an excuse for any criminal to go into the neighborhood, where, otherwise, a stranger would be under the ban of suspicion. Besides, open shops invite loiterers and idlers to congregate; and the places of such congregations need police protection. In the second place, the zoning of a city into residence districts and commercial districts is a matter of economy in street paving. Heavy trucks, hauling freight to and from places of business in residence districts, require the city to maintain the same costly pavement in such districts that is required foi business districts; whereas, in the residence districts, where business establishments are excluded, a cheaper pavement serves the purpose. It is pointed out, too, that the fire hazard is greater in the neighborhood of business establishments than it is in residence districts. A better and more expensive fire department—better equipment and younger and stronger men—are needed in the business centers, where the buildings are taller, than in the residence districts.

"Aside from considerations of economic administration, in the matter of police and fire protection, street paving, etc., any business establishment is likely to be a genuine nuisance in a neighborhood of residences. Places of business are noisy; they are apt to be disturbing at night; some of them are malodorous; some are unsightly; some are apt to breed rats, mice, roaches, flies, ants, etc. Property brings a better price in a residence neighborhood where business establishments are excluded than in a residence neighborhood where an objectionable businesss is apt to be established at any time."

I shall not burden this opinion with a review of the cases sustaining zoning ordinances of municipalities for the purpose of pointing out how in some of them at least the particular use which

the courts held that the ordinance might inhibit was well within the condemnation of seasoned precedent and therefore, in the light of the particular facts, need not be given a general application. The general language in those cases, however, is broad enough to sustain the complainant's contention. In view of the recognition by the courts deciding these cases that notwithstanding the general validity of the given ordinance, yet any case of oppression arising under it may be judicially dealt with, it is apparent that the decisional value of each case is dependent upon the special facts which it presents. In none of them was a question presented similar in its circumstances to those presented by the defendant's situation in the instant case. It may, therefore, be said that no authority has been cited which, when examined with reference to the facts, holds against the contenions of the defendant here.

I suppose the cases which present the nearest analogy to this one are those which hold that a city by its zoning plan may banish a store from a residential district. Yet stores hardly present an analogous case. For it is common knowledge that stores are found in great abundance in thickly populated communities, and hence those considerations which courts have suggested respecting increased traffic on streets, increase in fire hazard, littering up the surroundings, more expensive street paving, etc., occasioned by the presence of stores, may for the moment be conceded to have some logical pertinency and weight. The presence of one store alone may not give significance to these considerations. But it may be argued that if one is permitted, others, out of a spirit of follow-the-leader, may soon infest a neighborhood and thus by their multiplying numbers soon develop a condition which presents the reality of all these considerations. And so, it may be said, the city is justified in forefending against this possibility by confining stores within restricted areas.

Granting to this argument the full force of what it may be worth, it remains true that the presence of a private hospital in a neighborhood can by no possibility visit such results upon a community. Experience shows that hospitals are not so numerous in communities as are stores, and everybody knows that hospitals, private or public, can never exist in a community in large number. It is inconceivable to think that any residential district can suffer

what is called a blight by reason of the presence of private hospitals. Experience shows that in respect of probable consequences occasioned by the introduction of a hospital in a neighborhood, the same are negligible as compared with the establishment of a store. Those cases, therefore, which hold that it is beyond the power of the State to authorize the prohibition of use of property for store purposes in residential districts constitute strong authorities in favor of the defendant here. Such cases are the following: *Spann v. Dallas*, 111 *Tex.* 350, 235 *S. W.* 513, 19 *A. L. R.* 1387; *Dallas v. Burns*, (*Tex. Civ. App.*) 250 *S. W.* 717; *Fitzhugh v. Jackson, et al.*, 132 *Miss.* 585, 97 *So.* 190, 33 *A. L. R.* 279; *People v. Chicago*, 261 *Ill.* 16, 103 *N. E.* 609, 49 *L. R. A.* (*N. S.*) 438, *Ann. Cas.* 1915A, 292; *Willison v. Cocke*, 54 *Colo.* 320, 130 *Pac.* 828, 44 *L. R. A.* (*N. S.*) 1030; *Ignaciunas v. Risley*, 98 *N. J. Law*, 712, 121 *Atl.* 783; *Goldman v. Crowther, et al.*, (*Md.*) 128 *Atl.* 50. Every consideration which denounces an attempt to exclude stores from residential sections applies with added force to an attempt to exclude the decidedly less objectionable business which the defendant proposes to conduct in her home. In Missouri, the Supreme Court of that State has gone further than the courts which decided the cases above cited, for it has held that it is not permissible for zoning laws to exclude from residential sections an ice manufactory or a rag and junk business. *State v. McKelvey*, 301 *Mo.* 1, 256 *S. W.* 474; *St. Louis c. Evraiff*, 301 *Mo.* 231, 256 *S. W.* 489. In *Ambler Realty Co. v. Euclid, supra*, decided in the United States District Court, Northern District of Ohio, the court goes as far if not farther even than does the Supreme Court of Missouri.

Cases which in their general language take a different view are the following: *Opinion of the Justices, supra*; *Building Inspector v. Stoklosa*, (*Mass.*) *supra*; *Spector v. Building Inspector*, (*Mass.*) *supra*; *Brett v. Building Commissioners*, (*Mass.*) 145 *N. E.* 269; *Ware v. Wichita, supra*; *State v. Harper*, 182 *Wis.* 148, 196 *N. W.* 451, 33 *A. L. R.* 269; *State v. New Orleans, supra*; *Des Moines v. Manhattan Oil Co.*, 193 *Iowa*, 1096, 184 *N. W.* 823, 188 *N.W.* 921, 23 *A. L. R.* 1322; *Salt Lake v. Western Co.*, 55 *Utah*, 447, 187 *Pac.* 829; *Memphis v. Spencer-Sturla Co., supra*. As before indicated, the sweeping language of some of these cases when read in the light of the precise question propounded by their facts can-

not be regarded as pertinent authorities upon the case which the defendant's particular situation presents.

Some attempt is made by some of the courts which sustain the zoning ordinances to lay stress upon the point that a distinction is to be drawn between those ordinances which are comprehensive in their zoning and those which apply to restricted areas, and on the strength of this distinction many of the cases herein cited as favoring the defendant's contention are, because the ordinances involved in them were not general and comprehensive, said to be of no value as authorities where we have as here a general and comprehensive zoning scheme. It is difficult however to see wherein the distinction referred to can support itself in reason. In *Ambler Realty Co. v. Euclid, supra,* it was observed that the principle was the same, whether the zoning ordinance applied to the entire city or to parts only of a city, provided the part to which it is applied is an area sufficiently large to justify separate treatment. So far as the rights of the individual are concerned any ordinance which zones part of a city, zones all of it. It must be so, because if a dozen blocks only are zoned as residential districts, it means that the rest are zoned for all other purposes, even though the ordinance makes no mention of them. The chief difference between comprehensive zoning and partial zoning, it would seem, consists in this, that in the case of the latter fewer people among those similarly situated would probably be assured freedom from business neighbors than in the case of the former, and conversely a greater number of householders would have to endure what the ordinance denounces as objectionable to householders. This might give rise to a debate, in the case of the partial zoning, as to whether equal protection of the laws was being denied, a debate which the present case does not provoke. It still leaves untouched the primary question with which we are here concerned, viz., whether the right of private property can be taken away when the circumstances of its use are inoffensive and of injury to no one. I am unable to find in the mere comprehensiveness of a zoning ordinance any circumstance which renders those things permissible which, if done on a smaller scale as in the case of partial zoning, would not be permissible. The distinction sought to be drawn by some courts,

therefore, between cases of comprehensive zoning on the one side and partial zoning on the other, does not appear to be well made.

It is suggested by the solicitor for the complainant (and his suggestion is supported by some judicial utterances ) that a general plan of comprehensive zoning is permissible under the police power because the municipality will, by relegating business and industry to compact sections, thereby save itself the expense of spreading over a larger area the heavy street construction and the additional police and traffic control, etc., which business sections demand in comparison with residence sections. With respect to this argument, it is to be observed first, that there is no human probability of such an accumulation of private hospitals of the kind with which we are here concerned as ever to necessitate the enlargement of the police force or the reconstruction of the streets by reason of increased traffic. And in the second place, the argument is of doubtful force generally. The construction of streets, the affording of police protection, etc., are but the ordinary duties which municipal governments owe their residents. The agencies for affording them are to be supplied by the city. It may or may not provide them in a sufficient and adequate manner. But it is the business of the city to provide them in such degree as it thinks the circumstances demand. It being a strictly municipal function to do so, it is likewise the municipal duty to pay for them. They are for the benefit of all and should be paid for out of the common treasury. The taxing power is available for funds to meet these outlays. To require the owner of private property to cease using it in an unobjectionable manner, solely because it is desired to save the citizens generally from paying more taxes for street and police expenditure, approaches very closely, if not completely, to a taking of private property for public use without just compensation.

Legislation under the police power has made a tremendous advance in recent years. The power is undoubtedly a broad one and its advance upon constitutional bulwarks is at times bold and always insidious. Unless it is kept within safe bounds the most cherished conceptions underlying our institutions will be gradually so whittled away as to leave nothing of them but a remembrance. So much in danger of destruction at the hands of the police power are the safeguards which constitutional provisions

have thrown about the right of the citizen to enjoy his property, that Mr. Justice Holmes, whose liberal recognition of the power's scope cannot be questioned, has felt called upon to sound a warning in the recent case of *Penn Coal Co. v. Mahon*, 260 *U. S.* 415, 43 *Sup. Ct.* 160, 67 *L. Ed.* 322, 28 *A. L. R.* 1321, in the following language:

"When this seemingly absolute protection [of private property] is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. ＊ ＊ ＊ The general rule at least is that, while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. ＊ ＊ ＊ We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

The absolute right of property which the literal language of constitutional provisions assure to the citizen, placed in his hands such an instrument of obstruction upon the State's activities, that judges were impelled by the logic of fundamental social conceptions to evolve the doctrine of reserved powers in the State which it must possess or fail in the accomplishment of many of its most important functions. Thus was created the police power. Is there not a danger in these days of rapid advance to desired ends, of so enlarging this power which was designed simply to qualify constitutional rights as to completely destroy them?

There are doubtless many features of the ordinance here involved which are entirely within the legitimate field of legislation available for occupancy by the police power. No attempt is made to here deal with such features, or to indicate generally how far the ordinance may be good. In disposing of this case adversely to the complainant, it is to be understood that nothing is decided except that which the facts of the case present for determination. Being unable to see anything in the defendant's business which calls for its banishment from a Residence "A" District in the interest of any proper object which the police power may legitimately serve, it follows that the bill must be dismissed with costs on the complainant.

Let a decree be prepared accordingly.