## WOMEN'S KANSAS CITY ST. ANDREW SOC. v. KANSAS CITY, MO.*
### No. 9348.

Circuit Court of Appeals, Eighth Circuit.
April 20, 1932.

*Rehearing denied May 31, 1932.

Frank Schibsby, of Kansas City, Mo., for appellant.

John B. Pew and Marcy K. Brown, Jr., both of Kansas City, Mo. (George Kingsley, of Kansas City, Mo., on the brief), for appellee.

Before STONE, KENYON, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an action brought to restrain appellee, hereinafter designated defendant, from enforcing against appellant, henceforth designated plaintiff, the terms of a zoning ordinance to prevent the use of plaintiff's property, hereafter called the locus, as a philanthropic "old ladies' home"; the claim being that the restrictions of the ordinance deprive plaintiff of its property without due process of law. The trial court found against plaintiff, and dismissed the bill of complaint. This appeal followed the adverse decree.

The facts are as follows:

Plaintiff is a charitable corporation organized under the laws of Missouri, and proposes to use the locus as a home for elderly white ladies who to be admitted must have reached the age of 65 years, must be sound in mind and body, and must pay an original entrance fee of $800. The locus was given to plaintiff for this purpose by Mrs. Mary Gair, a wealthy woman of Kansas City, in memory

of a deceased daughter. It consists of a lot 150 feet wide by 205 feet deep with a three-story, seventeen-room stone house built thereon. Structurally it is a single family residence property, and there is no question but that the physical property itself, as distinguished from the use to which it may be put, is in entire harmony with all of defendant's zoning regulations. The sole question of this case arises from defendant's attempt to forbid the particular use which plaintiff intends to make of it.

Defendant's zoning ordinance, following the usual pattern of modern zoning ordinances, has platted the city into what may be called, in accordance with the "uses" to which they are primarily "dedicated," first and second residence, retail business or commercial, light and heavy industrial, and unrestricted, use districts. Each use district except the last named, while dedicated primarily to a particular class of uses, is closed only to uses of a lower classification. Thus, a first residence district is one dedicated exclusively to what are classified by the ordinance as class U-1 uses; but a second residence district, while dedicated primarily to class U-2 uses, is not closed to class U-1 uses; a retail business district, while dedicated primarily to class U-3 uses, is closed only to class U-4, class U-5, class U-6, and class U-7 uses; and so on until class U-6 uses are assigned to districts altogether unrestricted, unrestricted to class U-7 uses as much as to class U-1, class U-2, class U-3, class U-4, or class U-5, uses. No territory has been set aside as the particular home of class U-7 uses; they were simply allowed the benefit of the failure to restrict class U-6 territory, and of section 10 (1) (e) of the ordinance, which provided that the board of zoning appeals could "permit the location of a class U-7 use in any use district provided such location will not seriously injure the appropriate use of neighboring property." And section 10 (2) of the ordinance provided that "a class U-7 use existing in any use district at the time of the passage of this ordinance shall be deemed an authorized use upon the lot devoted to such use at the time of the passage of this ordinance."

Class U-7 uses are called by the ordinance "Special Classes," and include: (1) Aviation field; (2) amusement park; (3) philanthropic or eleemosynary use or institution, hospital or sanitarium, institution for the care of feeble-minded or insane, or penal or correctional institution; (4) cemetery; (5) crematory; (6) sewage, refuse, or garbage disposal plant; (7) refuse dump.

In the light of the provisions of sections 10 (1) (e) and 10 (2) quoted above, it does not seem to have been the intention of the framers of the ordinance to exclude class U-7 uses from the city altogether, or to confine them to the unrestricted districts set apart in the river bottoms in the north part of the city as the special home of the uses of a nuisance class listed in class U-6 (petroleum refining, cement, lime, gypsum, or plaster of paris manufacture, chlorine or hydrochloric, nitric, picric, sulphurous, or sulphuric acid manufacture, smelting of copper, tin, zinc, or iron ores, manufacture or storage of explosives, except fireworks, distillation of bones, fat rendering, glue manufacture, slaughter of animals, stockyards, fertilizer manufacture from organic materials, reduction or dumping of garbage, offal, and dead animals, and "any other use the classification of which is not otherwise herein provided for"). It seems rather to have been their intention to recognize a class of uses, the location of which, whether in a district of high or of low use classification, could best be determined ad hoc, as the need should arise in each particular case. Property already devoted to a class U-7 use could continue to be devoted to that particular use, regardless of the use district in which it should happen to be located; and the devotion to a class U-7 use of property not already so devoted was to be determined in each particular case by the nature of the particular class U-7 use with reference to the district in which it should wish to locate.

Such being the nature of the class U-7 group of uses, the presumption of unreasonableness that first arises from the fact alone that all philanthropic and eleemosynary institutions as well as hospitals and sanitariums are placed by the ordinance alongside cemeteries, crematories, sewage and garbage disposal plants, and refuse dumps, in what appears at first glance to be a subnuisance classification, disappears.

Plaintiff in the instant case is concededly a philanthropic or eleemosynary institution within the meaning of the ordinance, and seeks to devote to a philanthropic or eleemosynary use property that is concededly within a first residence, or class U-1, use district. Class U-1 uses, as listed in the ordinance, include: (1A) Single-family dwelling. Publicly owned park. (1) Two-family dwelling. (2) Church. School. Community center building. Public library. Public museum. (3) Private club or fraternal order, excepting a club, the chief activity of which is a service customarily carried on as

a business. Public playground. Public recreation building. Water supply reservoir, filter bed or tower. Passenger station. Railway right of way not including railway yards. (4) Farming. Greenhouse. Nursery. Truck gardening.

In accordance with section 10 (1) (e) of the ordinance, quoted above, plaintiff on May 24, 1929, filed an application with the board of zoning appeals to have the locus re-zoned so as to permit of the class U–7 use to which plaintiff intended to devote it. The application was opposed by interested parties, and was denied by the board. Plaintiff then took certiorari proceedings to review the board's decision to the circuit court of Jackson county, Mo., which, however, sustained the board. Plaintiff duly appealed the circuit court's decision to the Supreme Court of Missouri, but dismissed the appeal when the Supreme Court decided the case of State ex rel. Nigro v. Kansas City et al., 325 Mo. 95, 27 S.W. (2d) 1030.

In that case it was determined that in a case of re-zoning the powers of the board of zoning appeals were limited to the making of recommendations to the city council. And an amendment to the zoning ordinance made June 2, 1930, provided that a change in use could likewise be effected only by another ordinance duly enacted by the council.

It thus became useless for plaintiff to carry further proceedings that were intended to compel the board of zoning appeals to do something which it had no power to do; and it next sought to have enacted by the city council an ordinance effecting the desired re-zoning or change in use. In this procedure plaintiff was again opposed by interested parties, and section 5 of the Enabling Act, pursuant to which the defendant's zoning ordinance was enacted, provided that, while the regulations, restrictions, and boundaries originally established could be amended, supplemented, changed, modified, or repealed, yet in case "of a protest against such change duly signed and acknowledged by the owners of ten per cent. or more, either of the areas of the land (exclusive of streets and alleys) included in such proposed change or within an area determined by lines drawn parallel to and one hundred and eighty-five (185') feet distant from the boundaries of the district proposed to be changed, such amendment shall not become effective except by the favorable vote of three-fourths of all the members of the legislative body of such municipality." Section 7263, Revised Statutes Missouri 1929. There having been such a protest, the favorable vote of 5 to 4 which the ordinance effecting the change desired by plaintiff received was insufficient, and it failed of enactment. Plaintiff then commenced the suit in the federal District Court, 54 F.(2d) 1071, which has resulted in this appeal.

We shall use the term "Board of Zoning Appeals" to cover also the "Board of Adjustment."

As the main question before this court is the reasonableness of defendant's ordinance in its proscription of the particular use which plaintiff desires to make of property zoned in a class U–1 use district, it is necessary to describe in some detail the locus in its relation to the district in which it has been zoned.

As before pointed out, the locus is situated on Forty-Fifth street between Rockhill road and Oak street. The numbered streets in Kansas City run east and west, and Forty-Fifth street, after crossing Rockhill road as it proceeds westward, "dead-ends" into Oak street. The distance along Forty-Fifth street between Rockhill road and Oak street is about 600 feet, and the territory that is thus bounded by Rockhill road on the east, by Oak street on the west, by Forty-Fifth street on the south, and by Forty-Fourth street on the north, is divided into four residence properties 150 feet wide by approximately 205 feet deep, and having a technical "frontage" on both Forty-Fifth and Forty-Fourth streets, although all the houses built thereon face Forty-Fifth street.

Proceeding westward from Rockhill road to Oak street, the first of these properties is the Fennell home, the second is the locus, the third consists of two duplexes owned by one R. P. Rice, and the fourth is the Lillis home. Structurally the locus, as much as the Fennell and Lillis homes, is a single family residence property entirely in harmony with its surroundings.

Oak street is at right angles with the numbered streets, but Rockhill road slants in a westerly direction as it proceeds northward until it turns into Forty-Third street.

Across Forty-Fourth street and slightly east of the locus is an apartment house, and around the corner from this apartment house, on the west side of Rockhill road between Forty-Fourth and Forty-Third streets, are several more apartment houses. They have all been there for about 15 years, and represent nonconforming uses already established at the time the zoning ordinance took effect.

The remainder of the north side of Forty-Fourth street is devoted to private residences.

On the west side of Oak street between Forty-Fifth and Forty-Fourth streets, there are located an art institute and Epperson Hall, a public hall for public entertainment. On the west side of Oak street between Forty-Fourth and Forty-Third streets are several apartment houses, and on the east side of Oak street between Forty-Fourth and Forty-Third streets is a nurses' headquarters. The northwest corner of the intersection at Forty-Third street is devoted to a business block; the northeast corner is devoted to apartment houses; and the southeast corner has already been re-zoned for business purposes.

· Directly south of the locus, between Forty-Fifth and Forty-Seventh streets and between Oak street and Rockhill road, lies a 20 to 22 acre tract which was once the estate of William Rockhill Nelson, and on which there has now been erected the William Rockhill Nelson Art Gallery, one of the foremost institutions of its kind in America.

Directly east of this tract, across Rockhill road, is Rockhill, a fashionable residence district. Directly west are some residences and a small park, and along Brush Creek boulevard on the southwest are some more apartment houses.

On the south of the whole territory just described is a district devoted mainly to residences, but which also contains the Barstow School for Girls, a new Jewish Memorial Hospital, and a site for a new municipal university.

Despite the presence of certain nonconforming uses, it is intended to make of this whole district a great art, cultural, and residence center; and it is claimed that Forty-Fifth street, though not the boundary of the district established by the ordinance, will make an idea "buffer" street to protect the part of the district not yet broken down from the part that has already been broken down to a very considerable extent. As was testified by a former chairman of the board of zoning appeals, "the most difficult problem in zone planning is to solve the problem of the boundary line, a buffer; this Forty-Fifth Street property is an ideal buffer between a beautiful residence section and the apartments, car lines and business on the north, the presence of which is a greater reason for maintaining Forty-Fifth Street as it is; this old ladies' home, in my opinion and that of the board, would be an entering wedge threatening the stability of the boundary line."

And as was testified to by the chairman of the zoning committee of the real estate board while the ordinance was being drawn up:

"One of the great problems is just where to place the areal limits; I am familiar with the fact that Forty-Fifth Street is the northern limit of the Rockhill home district and of the Art Gallery, with a University site further south that is expected to be connected up with the Art Gallery; if Country Club District is the largest I think this would be the next largest cultural and residential section in Kansas City; I would take in that protection the beautiful homes on the north side of Forty-Fifth Street; my study convinces me that the foundation of a zoning ordinance is protection, encouragement and development of private home ownership, the protection of the individual home; the protection encourages home building and is presumed to develop better citizenship and better family conditions; the ordinance fails unless there is dependability upon its being sustained.

"I think an old ladies' home at the locus would be unreasonable and break down the character of the particular district, probably not a break down, but an entering wedge resulting in breaking down the district for family residences; my experience on the plan commission was that when you break down the strict enforcement of the ordinance, deterioration follows rapidly; I do not think the Rockhill district has begun to deteriorate; it is far enough from downtown so as to continue to be desirable, there is no necessity for it ever deteriorating."

The chief objection to plaintiff's coming into the neighborhood seems to have come from the residents of the Rockhill district, and from the trustees of the various trusts connected with the William Rockhill Nelson Art Gallery. It seems that most of the nearby property owners on Forty-Fifth and Forty-Fourth streets at first gave their consents to plaintiff's coming into the neighborhood, but later withdrew such consents. The owner of the adjoining duplexes testified that having an old ladies' home as an immediate neighbor would diminish the value of his property, and it would affect his morals "to have it referred to as the old ladies' home next door."

It was testified that the locus, for plaintiff's purpose, was reasonably worth $43,500, but that for ordinary residence purposes it was not reasonably worth over $30,000. It was vacant at the time Mrs. Gair purchased it, and has been so ever since.

It was in evidence also that plaintiff does not intend ever to keep more than 12 ladies at the locus at a time, and that it does not intend ever to enlarge or change the present structure or put thereon or thereabouts any signs or other marks of an institutional nature. When asking the city council for an ordinance permitting the locus to be devoted to plaintiff's use, plaintiff offered to give a deed binding itself to these limitations upon the use.

The complaint set forth the use of the property as a home for 12 aged white ladies, free from any signs to indicate its use. In considering the case, therefore, we are warranted in considering this as the use intended.

Plaintiff attacks the zoning ordinance only as to the effect upon the use of its property as a home for aged white ladies, claiming that the restriction imposed amounts to a deprivation of its property without due process of law and denies to it the equal protection of the law.

Zoning as distinguished from regulation or proscription of a certain use of property is a twentieth century development, and has been productive of much litigation. Many of the subjects now dealt with by zoning ordinances were formerly matters of individual regulation under the police power of municipalities, such as control and regulation of places of public resort and amusement, the handling of explosives, the prevention of fires, the abolition of nuisances and other matters having relation to the public welfare. To meet the changing and complex conditions of urban life brought about largely by the industrial development of the country, and to separate industrial and business districts from residence districts, the zoning system has been evolved out of the laudable desire to make it possible for people to enjoy home life in peace and quietude.

■ Zoning laws rest upon the police power of the states, and, when they are fairly within the well-recognized bounds of such power they are valid, even though they may entail some hardship upon property owners.

■ While such police power is broad, there are limitations to its exercise, which the courts have not attempted to accurately define. However, restrictions by zoning ordinances imposed upon the use of one's property to be valid must bear some "substantial relationship to the public health, safety, morals or general welfare." The reserved police power of the state must stop when it encroaches on the protection accorded the citizen by the Federal Constitution. Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Thomas Cusack Company v. City of Chicago et al., 242 U. S. 526, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594; Pennsylvania Coal Company ·v. Mahon et al., 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321; Village of Euclid et al. v. Ambler Realty Company, 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Nectow v. City of Cambridge et al., 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842; Oklahoma City, Okl. et al. v. Dolese et al. (C. C. A.) 48 F.(2d) 734.

■ Private property cannot, under the guise of police power, be subjected to unreasonable annoyance and arbitrary restriction of its use where public welfare can in no way receive benefit by such restriction. Buchanan v. Warley, 245 U. S. 60, 38 S. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201; Louis K. Liggett Company v. Baldridge, Attorney General of Pennsylvania, et al., 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204; Village of Terrace Park et al. v. Errett (C. C. A.) 12 F.(2d) 240; Anderson et al. v. Jester et al., 206 Iowa, 452, 221 N. W. 354.

■ Where the legally constituted body, to determine and establish zoning ordinances, has acted within the scope of the police power, courts will not substitute their judgment as to the wisdom or propriety of said action for that of such body. Its discretion is not for review by the courts. Zahn et al. v. Board of Public Works et al., 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074; Nectow v. City of Cambridge et al., 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842; Standard Oil Company et al. v. City of Marysville et al., 279 U. S. 582, 49 S. Ct. 430, 73 L. Ed. 856; American Wood Products Co. v. City of Minneapolis et al. (C. C. A.) 35 F.(2d) 657; Marx et al. v. Maybury, Director of Licenses of Washington, et al. (D. C.) 36 F.(2d) 397; Marblehead Land Co. et al. v. City of Los Angeles (C. C. A.) 47 F.(2d) 528.

■ If the question is fairly debatable as to whether the zoning ordinance is arbitrary

and unreasonable and has no substantial relation to public health, safety, morals, or general welfare, the court will not interfere. Radice v. People of the State of New York, 264 U. S. 292, 44 S. Ct. 325, 68 L. Ed. 690; Village of Euclid et al. v. Ambler Realty Company, 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Zahn et al. v. Board of Public Works et al., 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074; Marblehead Land Co. et al. v. City of Los Angeles (C. C. A.) 47 F.(2d) 528.

A zoning ordinance may be valid in its general aspects, and yet as to a particular state of facts involving a particular owner affected thereby may be as to such owner so clearly arbitrary and unreasonable as to be unenforceable. Village of University Heights et al. v. Cleveland Jewish Orphans' Home (C. C. A.) 20 F.(2d) 743; Jones et al. v. City of Los Angeles et al., 211 Cal. 304, 295 P. 14.

We do not feel called upon to pass on the question of the constitutionality of the zoning ordinance as to its general scope, but only as to whether the restriction upon the use of plaintiff's property is within the ban of the Fourteenth Amendment.

The question before us is not the propriety of the boundary line established by the ordinance or the importance of Forty-Fifth street as a "buffer," but whether defendant's zoning ordinance, with reference to the particular property plaintiff has acquired and the use to which plaintiff seeks to put it, is so unreasonable and arbitrary and unrelated to the legitimate ends of the police power that it cannot be enforced as to said property.

Courts have gone far in sustaining the exercise of police power, and there has been a gradual expansion of such power justified by changing conditions. Originally the police power was exercised in the interest of public health, safety, peace, and morals. Then it expanded by including in its province questions of "general welfare" and regulations designed to promote not only public health, morals, and safety, but regulations to promote "public convenience" and "general prosperity." Chicago, Burlington and Quincy Railway Company v. People of the State of Illinois ex rel. Drainage Commissioners, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; Bacon v. Walker, 204 U. S. 311, 27 S. Ct. 289, 51 L. Ed. 499; Eubank v. City of Richmond, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N.

S.) 1123, Ann. Cas. 1914B, 192; Gorieb v. Fox et al., 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210; Miller et al. v. Board of Public Works of City of Los Angeles et al., 195 Cal. 477, 234 P. 381, 38 A. L. R. 1479; Jones et al. v. City of Los Angeles et al., 211 Cal. 304, 295 P. 14; Wulfsohn v. Burden, Inspector of Buildings of City of Mount Vernon, 241 N. Y. 288, 150 N. E. 120, 43 A. L. R. 651.

In Welch v. Swasey et al., 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923, the Supreme Court held that an act of the Massachusetts Legislature limiting heights of buildings in Boston, in view of the decision of the highest court in Massachusetts holding the discrimination was based on reasonable grounds, was a proper exercise of the police power of the state, and not unconstitutional under the equal protection and due process clause of the Fourteenth Amendment.

In Noble State Bank v. Haskell, 219 U. S. 104, 111, 31 S. Ct. 186, 188, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, the high-water mark of police power was reached in the following utterance of Mr. Justice Holmes: "It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U. S. 518, 17 S. Ct. 864, 42 L. Ed. 260. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

In Pennsylvania Coal Company v. Mahon et al., 260 U. S. 393, 413, 43 S. Ct. 158, 159, 67 L. Ed. 322, 28 A. L. R. 1321, the same justice seems to have sounded a note of caution as to further extension of the police power. There referring to values of property yielding to the police power, he said: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is

given to the judgment of the Legislature but it always is open to interested parties to contend that the Legislature has gone beyond its constitutional power." Also at page 416, of 260 U. S., 43 S. Ct. 158, 160, 67 L. Ed. 322, 28 A. L. R. 1321: "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

In Reinman v. City of Little Rock, 237 U. S. 171, 35 S. Ct. 511, 59 L. Ed. 900, the court held that it was within the police power of a state to regulate or prohibit a livery stable as a nuisance, and, if such power was not exercised arbitrarily or with unjust discrimination, it did not infringe upon rights guaranteed by the Fourteenth Amendment.

In Hadacheck v. Sebastian, Chief of Police of the City of Los Angeles, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927, it held that an ordinance of Los Angeles prohibiting the manufacture of bricks within specified limits of the city was not unconstitutional as depriving the owner of a brick factory of his property without due process of law.

In Thomas Cusack Company v. City of Chicago et al., 242 U. S. 526, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594, it was held to be within the police power of a city to prohibit, in the interest of the safety, morality, health, and decency of the community, the erection of billboards in residence districts.

In Buchanan v. Warley, 245 U. S. 60, 38 S. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201, a city ordinance forbidding colored persons to occupy houses in blocks where the greater number of houses were occupied by whites was held unconstitutional as a deprivation of property without due process of law, and the same race and color question was involved in a similarly decided case in Harmon v. Tyler, 273 U. S. 668, 47 S. Ct. 471, 71 L. Ed. 831.

Village of Euclid et al. v. Ambler Realty Company, the first zoning case to reach the Supreme Court, 272 U. S. 365, 387, 47 S. Ct. 114, 118, 71 L. Ed. 303, 54 A. L. R. 1016, blazed a clear trail for the passage of zoning ordinances, and is the one generally relied on to sustain them. The whole philosophy underlying the condition and expansion of police power to cover zoning ordinances is clearly and completely stated in this case by Mr. Justice Sutherland, as follows: "Reg-ulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the meaning, but to the application of constitutional principles, statutes and ordinances, which after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall." The court there held that a zoning ordinance of the village of Euclid, forbidding the erection in designated residential districts of business houses, retail stores, and apartment houses, was a valid exercise of police power. We quote further from that opinion, at page 391 of 272 U. S., 47 S. Ct. 114, 119, 71 L. Ed. 303, 54 A. L. R. 1016: "The decisions enumerated in the first group cited above agree that the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community, by excluding from residential areas the confusion and danger of fire, contagion, and disorder, which in greater or less degree attach to the location of stores, shops, and factories. Another ground is that the construction and repair of streets may be rendered easier and less expensive, by confining the greater part of the heavy traffic to the streets where business is carried on."

In Zahn et al. v. Board of Public Works

et al., 274 U. S. 325, 328, 47 S. Ct. 594, 595, 71 L. Ed. 1074, a zoning ordinance of the city of Los Angeles, dividing the city into five building zones, and prescribing the kind of buildings that could be erected in each zone, was held constitutional in its general scope. The court there said: "The common council of the city, upon these and other facts, concluded that the public welfare would be promoted by constituting the area, including the property of plaintiffs in error, a zone 'B' district, and it is impossible for us to say that their conclusion in that respect was clearly arbitrary and unreasonable. The most that can be said is that whether that determination was an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question."

In Nectow v. City of Cambridge et al., 277 U. S. 183, 188, 48 S. Ct. 447, 448, 72 L. Ed. 842, the court held that the zoning ordinance of the city of Cambridge, which put Nectow's land in a district in which was permitted only dwellings, hotels, clubs, churches, schools, etc., invaded his property rights, that there was no basis to support that invasion, and the ordinance was invalid. After discussing the claim that the court was not warranted in substituting its judgment for that of the zoning authorities, as is earnestly contended here, the court said: "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare."

One of the most important cases determined by the Supreme Court is Washington ex rel. Seattle Title Trust Company, Trustee, etc., v. Roberge, Superintendent of Building of Seattle, 278 U. S. 116, 123, 49 S. Ct. 50, 52, 73 L. Ed. 210, and it is much in point in the case at bar. There a philanthropic home for the aged poor was involved. Under the zoning ordinance of the city of Seattle such a home could not be erected in the district in which it was in fact located, which was the first residence district. The court states that from the record it does not appear the exclusion of a new home to be built in place of the old one is requisite to the general zoning plan. The court does leave open expressly the question whether, "consistently with the Fourteenth Amendment, it is within the power of the state or municipality by a general zoning law to exclude the proposed new home from a district defined as is the first district in the ordinance under consideration." While this case can be distinguished from the case at bar, the record there could not have been more barren of evidence, showing any conceivable relationship between the proposed home and the public health, safety, morals, and general welfare of the public, than is the record in the case at bar. The court in its opinion said, at page 122 of 278 U. S., 49 S. Ct. 50, 52, 73 L. Ed. 210: "It is not suggested that the proposed new home for aged poor would be a nuisance. We find nothing in the record reasonably tending to show that its construction or maintenance is liable to work any injury, inconvenience or annoyance to the community, the district or any person." The court was clearly referring to such "injury, inconvenience or annoyance" as would be within the scope of the police power to alleviate.

A very important case is Village of University Heights et al. v. Cleveland Jewish Orphans' Home, 20 F.(2d) 743, 745, where the Circuit Court of Appeals of the Sixth Circuit held that a zoning ordinance of the village of University Heights, a suburb of Cleveland, as applied to a Jewish Orphans' Home sought to be constructed in a residential district, was unreasonable, and that the police power of the city was not broad enough to exclude this orphanage home from the district in question. The village was enjoined from enforcing the ordinance as to the orphans' home. In discussing the police power of the municipality to exclude such orphans' home, the court said: "That power has been held, as we have seen, to include the right generally to exclude business houses, stores, shops, and apartment houses from strictly residential districts. It has never been held to include the right to prohibit the use for orphan children of cottages built according to the requirements of the municipality. We can see many valid reasons, affecting the public welfare, which would justify the exclusion of factories, business houses, shops, and even apartment houses from strictly residential districts, but which would not apply to the use of structurally proper cottages for an orphanage; and while an orphanage would no doubt be less agreeable to the community in some respects than a private school or private residences, we are un-

willing to hold that it is within the power of the village to prohibit the use of cottages of this character for that purpose."

In American Wood Products Co. v. City of Minneapolis et al. (C. C. A.) 35 F.(2d) 657, we sustained an ordinance of the city of Minneapolis which created a district known as a "multiple dwelling" district, and forbade the erection therein of additions to factories or of new factory buildings. We held that such ordinance was not so arbitrary and unreasonable as to deprive property owners of the equal protection of the law or amount to a taking of property in violation of the Fourteenth Amendment to the Constitution. We were not satisfied that the ordinance had no substantial relation to public health, safety, morals, or general welfare, and that, inasmuch as the subject was fairly debatable, we should not interfere.

The progress of the Missouri courts toward the sustaining of zoning ordinances has been slow. Originally they took strong grounds against the exclusion from residential districts of manufacturing and other businesses which are now held to be within the police power, and were especially severe on permitting the limitation of use of one's property for any æsthetic reasons. City of Sturgeon v. Wabash Ry. Co. et al., 223 Mo. App. 633, 17 S.W.(2d) 616.

In Mayor and Council of Wilmington v. Turk, 14 Del. Ch. 392, 129 A. 512, 521, the court said: "In Missouri, the Supreme Court of that state has gone further than the courts which decided the cases above cited, for it has held that it is not permissible for zoning laws to exclude from residential sections an ice manufactory or a rag and junk business."

In State ex rel. Oliver Cadillac Co. v. Christopher, City Building Commissioner of St. Louis et al., 317 Mo. 1179, 298 S. W. 720, the zoning ordinance of the city of St. Louis was held to be a valid exercise of police power, to which decision there was a most vigorous dissent on the part of Judge Graves, joined in by two of the other judges.

In Euclid v. Ambler Realty Co., supra, the court discusses the rational relationship to the health and safety of the communities of the exclusion of buildings devoted to other than residential purposes from a residence district. Not one of the grounds referred to could be applied to the situation as to this old ladies' home. Surely the presence of 12 elderly ladies in a home which they make their residence could not have any effect on public health, morals, safety, or public welfare. Such situation would not tend to disorder, it would not spread contagion, or increase traffic, nor make difficult the enforcement of traffic regulations. What then is the complaint? What is the basis for exclusion? Witnesses for the city place emphasis on the fact that it is an eleemosynary institution; that it would be an entering wedge to break down the residence district; that all experts on zoning warn against the danger of entering wedges in a zoning system; that it in some way affects deleteriously the cultural and educational center that Kansas City is building up in that area; that such an institution has a depressing effect, in that wheeled chairs and invalidism are ever present there; that such settings are not conducive to the happiness of the people who live in the residence district, and cause gloom to cloud an otherwise peaceful existence. There could be nothing in the appearance of the home to offend the most æsthetic taste. It will not indicate any use but for residence purposes. The language of Mayor and Council of Wilmington v. Turk, 14 Del. Ch. 392, 129 A. 512, 517, where the attempt was made to proscribe a private hospital is in point: "While it is proper to speak of her residence as a hospital, yet in its outward features it presents the appearance of a residence. The building itself was constructed as a residence, is now used as such and will continue to be used as such, the defendant and her family residing there. If æsthetic considerations were allowed as permissible to be promoted by the police power, which as hereinafter observed they are not, it would still be true that, so far as all outward aspects could disclose, the defendant's proposed home and hospital would present the appearance of being a residence building in harmony with the residential character of the neighborhood."

The same is true here. There are to be no signs on the home. It is a substantial residence for which Mrs. Gair, the donor, paid $42,500. It would seem under the ordinance that, if some one owned this place and desired to take roomers and boarders, he or she could take the old ladies in that capacity, and there would be no violation of the ordinance. Would a boarding house for old ladies be less offensive than a charitable home? While it is in fact an eleemosynary institution, there would be nothing in the appearance of the place to so indicate further than the presence amid the place of a few elderly ladies, which would be the situation were it a boarding house. As to the

objection of its being an eleemosynary or philanthropic institution, it may be said that the magnificent Nelson Art Gallery is also in the nature of a philanthropic institution, so the objection seems to be to the particular kind of a philanthropic institution.

Certainly the fact that aged people may have a depressing effect on some people is not sufficient to exclude such people from a district. There is no limit to the causes that may depress people, but they do not furnish a basis for the support of a restriction as to use of one's property. What was said by the Texas court in Spann v. City of Dallas et al., 111 Tex. 350, 235 S. W. 513, 516, 19 A. L. R. 1387, with respect to the noise and annoyance incident to the operation of a grocery store in a residential district, would apply a fortiori to the so-called "depressing influence" of elderly residents, viz.: "It could disturb or impair the comfort of only highly sensitive persons. But laws are not made to suit the acute sensibilities of such persons. It is with common humanity—the average of the people, that police laws must deal. A lawful and ordinary use of property is not to be prohibited because repugnant to the sentiments of a particular class."

Mere æsthetic considerations in themselves have never been held to bear such relationship to public welfare as to sustain the restrictions of zoning ordinances. They may be incidental to the main purposes, and would not render an ordinance invalid. In City of Youngstown et al. v. Kahn Bros. Bldg. Co., 112 Ohio St. 654, 148 N. E. 842, 843, 844, 43 A. L. R. 662, the court in a zoning case said: "It is conceded, also, that the police power is not unlimited and must not be arbitrarily exercised, that the police power cannot be invoked for purely æsthetic considerations, nor to promote merely private comfort or private welfare. * * * Moreover, authorities in general agree as to the essentials of a public health program, while the public view as to what is necessary for æsthetic progress greatly varies. Certain Legislatures might consider that it was more important to cultivate a taste for jazz than for Beethoven, for posters than for Rembrandt, and for limericks than for Keats. Successive city councils might never agree as to what the public needs from an æsthetic standpoint, and this fact makes the æsthetic standard entirely impractical as a standard for use restriction upon property. The world would be at continual seesaw if æsthetic considerations were permitted to govern the use of the police power." Also, in MacRae v. City of Fayetteville et al., 198 N. C. 51, 150 S. E. 810, 812, this is said: "It [a gasoline station] might be to some an 'eyesore,' but the law does not allow æsthetic taste to control private property, under the guise of police power." In City of St. Louis v. Evraiff, 301 Mo. 231, 256 S. W. 489, 495, the Supreme Court of Missouri held invalid a zoning ordinance of the city of St. Louis. The court there said: "Regulations based on æsthetic considerations are not in accord with the spirit of our democratic institutions." See, also, City of St. Louis v. Dreisoerner, 243 Mo. 217, 147 S. W. 998, 41 L. R. A. (N. S.) 177. In St. Louis Poster Advertising Co. v. City of St. Louis et al. (Mo.) 249 U. S. 269, 39 S. Ct. 274, 63 L. Ed. 599, and in Welch v. Swasey et al. (Mass.) 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923, the court referred to æsthetic considerations as merely incidental or ancillary to the main purposes of the ordinance.

The objection that a home of this character is an entering wedge and will result in breaking down the residential section is hardly tenable. We are passing only on a question affecting this particular piece of property. It can have no bearing on any other property in the district.

It would seem that the objections are not so much that the intended use of this home really interferes with a zoning plan supposed to benefit the entire city, but rather because of the feeling which the people of a particular section have against an eleemosynary institution of this nature being located in such area. The restriction complained of goes to the extent of determining who shall occupy for residence purposes a residence that meets in every respect the requirements of the U–1 residence district. This would seem to go further than the police power has ever attempted to go in these zoning ordinances, except possibly in the Roberge Case, supra.

To justify such restriction the police power would have to be extended, not only to restricting certain districts to residence purposes, but to restricting such districts to particular classes of residents, and this has been quite universally condemned by the decisions. In Village of University Heights et al. v. Cleveland Jewish Orphans' Home (C. C. A.) 20 F.(2d) 743, the court held against discrimination as to the orphanage. The only difference between that case and this apparently is the question of age of the

occupants. It would be very difficult to satisfactorily distinguish the Jewish Orphanage Case from this. When the question arose as to the right to discriminate against colored citizens, the Supreme Court held, as we have before pointed out, that such discriminations to color or race violate constitutional inhibitions. If there is no basis for restrictions as to color or race or as to an orphans' asylum, how can a discrimination based on age or poverty be sustained? In Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 1070, 30 L. Ed. 220, it is pointed out that the guaranties of protection contained in the Fourteenth Amendment to the Constitution are universal in their application "to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality," to which might be added "or of age or poverty."

█ If the restriction complained of here were an independent regulation or proscription, it could not in our opinion stand. It would be depriving plaintiff of the use of his property without due process of law. Does the fact that the proscription is part of a zoning system which is claimed to be for the general benefit of the public change the situation and permit the restriction of the use of plaintiff's property? That question was left open in the Roberge Case, and is the serious one in this controversy. It is true that, when a particular restriction is a part of a comprehensive zoning system, other reasons may be found for sustaining it than would be the case if it stood alone as a restriction independently imposed. If the general plan, of which the particular restriction is an integral part, bears a definite and clear relationship to the well-established purpose of the police power, then the argument may well be made that the validity of the individual restriction may be based, not alone on its immediate relation to health, safety, morals, and general welfare, but as part of, and in furtherance of, a general plan designed to foster those ends. Only in this way could a justification be found for excluding stores, apartment houses, and places of business in most instances from residential districts, and courts have placed emphasis upon the relation of a general zoning plan to the recognized purpose of police power as distinguished from various individual restrictions. In Village of Euclid et al. v. Ambler Realty Co., 272 U. S. 365, 390, 47 S. Ct. 114, 119, 71 L. Ed. 303, 54 A. L. R. 1016, the court said: "This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded. Upon that question this court has not thus far spoken." In City of Aurora v. Burns, 319 Ill. 84, 149 N. E. 784, 788, it is said: "Zoning necessarily involves a consideration of the community as a whole and a comprehensive view of its needs. An arbitrary creation of districts, without regard to existing conditions or future growth and development, is not a proper exercise of the police power and is not sustainable. No general zoning plan, however, can be inaugurated without incurring complaints of hardship in particular instances. But the individual whose use of his property may be restricted is not the only person to be considered. The great majority, whose enjoyment of their property rights requires the imposition of restrictions upon the uses to which private property may be put, must also be taken into consideration. The exclusion of places of business from residential districts is not a declaration that such places are nuisances, or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder, and dangers which often inhere in unregulated municipal development."

█ Counsel for appellee emphasize in their brief the language of the Supreme Court in the Euclid-Ambler Case, supra, that "The inclusion of a reasonable margin, to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity," and the argument is that this restriction as to the old ladies' home is a part of the reasonable margin in the general zoning plan necessary to secure effective enforcement. Whether the margin is a reasonable one or so extended that it conflicts with the Constitution of the United States and takes private property without compensation under the guise of a regulation in the interest of the general public is apt to be a troublesome question. The courts have recognized the force of a general zoning plan under the police power which divides a city into various districts, and bears some substantial relation to the general welfare of the city in a material way, where a restriction therein could not stand except as a part of the general plan of the ordinance. This plan, however, may exceed the limits of the police power, and, if

the individual restriction is essential to the general plan in so far as such plan itself exceeds the limits of the police power, the individual restriction of course falls. There must be limits as to what even a general plan may do, and the mere comprehensiveness of the zoning ordinance is in itself no justification for each separate restriction that the ordinance imposes. However, without going further into that troublesome domain, we inquire whether this restriction is an essential part of the zoning plan. In Seattle Trust Co. v. Roberge, supra, the court found that the exclusion of a home from the district was not indispensable to the general zoning plan. The ordinance here provides that the zoning board may "permit the location of a Class U–7 use in any use district provided such location will not seriously injure the appropriate use of neighboring property"; therefore the power exists to locate this home in this district or in any other district by the proper action of the city council. Thus it is apparent that the restriction placed by the ordinance upon plaintiff's property is not essential to the general zoning plan. The ordinance bars plaintiff from U–2, U–3, U–4, and U–5 districts as much as from U–1 district, and then provides that it may locate in any district if permission is received from the board of zoning appeals. After the decision of the Supreme Court of Missouri in State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S. W.(2d) 1030, and a resulting amendment to the zoning ordinance, permission to locate anywhere in any district could be obtained only through another ordinance properly enacted, and if 10 per cent. of the adjoining property owners protested, then the ordinance required a two-thirds vote of the council. Section 7263, R. S. Mo. 1929. Such provisions show that the plan, of which the restriction imposed against appellant is a part, is the plan that shall be developed as subsequent ordinances either grant or deny to institutions of a like character as appellant permission to locate in particular use districts. Permission could be denied to appellant, but could be granted by a sufficient vote of the council to another institution of an exactly similar character. Unjust discrimination is thus made possible. The ordinance in question attempts to bar institutions similar to appellant from all districts except U–7, and then authorizes the making of exceptions equally in all districts without distinction. Therefore it would seem that the city could not urge in refusing permission to use its property for an old ladies' home in the U–1 district, in which it is located, that it is following out any general plan embodied in the ordinance. It is apparently following out the plan of some zoning experts or of residents of this particular U–1 district, but not a plan clearly discernible and fixed in the ordinance itself. The case for defendant would be stronger had it definitely allotted certain territory to institutions of a like character with plaintiff. Plaintiff is placed under class U–7 uses, which provides for aviation fields, amusement parks, hospitals, sanitariums, cemeteries, institutions for the feeble-minded or insane, penal institutions, crematories, sewage, refuse or garbage disposal plants, or refuse dumps.

■ This property was acquired by plaintiff after the passage of the ordinance. In the Roberge Case, supra, the property was not acquired after the ordinance, but rebuilding was attempted to be done thereafter. It would seem the fact of taking title to the locus after the passage of the zoning law was not important. The ordinance would be valid or invalid in its application to plaintiff the same as in its application to past owners. If it was not valid as to past owners, it would not be valid as against the plaintiff who stands in the place of its grantor and has the same rights that said grantor had.

■ Defendant urges that many fair-minded men in Kansas City both in official position and otherwise with no dissenting voice have expressed their judgment that this property should not be released from the restrictions of the zoning ordinance, and that therefore it is difficult to say the regulation is arbitrary and unreasonable and has no relation to the public welfare, or that it is so plainly violative of the Fourteenth Amendment that the question is not even debatable. This argument overlooks the fact that a majority of the city council favored by their votes a re-zoning of the property. Be that as it may, it is true that the court should not interfere with the action of the legally constituted authorities of Kansas City in their discretionary acts under the police power. They know best what is for the interest of the city, and are undoubtedly acting in accordance therewith. If the restriction here complained of does in fact, however, have no relationship to the fundamentals upon which zoning statutes can be sustained, viz. public health, safety, moral, and general welfare, and is not essential to a general zoning ordinance based on these considerations, then the courts should not hesitate to protect plain-

tiff from being deprived of the use of its property under the guise of police power.

Reference should be made to the claim of defendant that plaintiff is estopped to allege the unconstitutionality of either section 7263, Revised Missouri Statutes 1929, or the zoning ordinance, on the theory that it has asserted rights thereunder. The defendant relies on Daniels v. Tearney, 102 U. S. 415, 26 L. Ed. 187, and Grand Rapids and Indiana Ry. Co. v. Osborn, 193 U. S. 17, 24 S. Ct. 310, 48 L. Ed. 598. One cannot secure rights or benefits under a statute and at the same time attack it as unconstitutional, but plaintiff here received no benefits under the statute or ordinance, and the receipt of benefits is an essential element of estoppel in this class of cases, Hurley v. Commission of Fisheries of Va. et al., 257 U. S. 223, 42 S. Ct. 83, 66 L. Ed. 206; Frost, etc., v. Corporation Commission of Oklahoma et al., 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483, and, secondly, there has been no change whatever in the position of the city because of plaintiff's action. It seems clear there is no element of estoppel in the situation presented. Plaintiff did seek a re-zoning before the zoning board which was refused. A writ of certiorari to review the same was filed, which upon hearing was quashed. Appeal was taken to the Supreme Court. After that court decided State ex rel. Nigro v. Kansas City et al., 325 Mo. 95, 27 S.W.(2d) 1030, in which the court held the zoning board had no power to re-zone, that the trial court was limited to correcting illegality, and was without power to supervise the board's discretion, plaintiff dismissed its appeal. It caused to be introduced into the city council an ordinance permitting the desired use, which did not secure the necessary number of votes, a protest having been filed of more than 10 per cent. of the property owners within an area of 185 feet of this plot, which made necessary under section 7263, Revised Statutes of Missouri 1929, a three-fourths vote of all the members of the legislative body of such municipality. There was no court decision on the merits of the controversy, and the matter could not have been adjudicated in the state action. Plaintiff in its action in the state court was seeking a re-zoning. It misconceived the power of the zoning board and the court to grant the relief. We see no element of res adjudicata in these efforts of plaintiff to secure relief in the state proceedings. Continental Oil Co. v. City of Twin Falls et al., 49 Idaho, 89, 286 P. 353. Our conclusion is that the restriction upon the use of plaintiff's property is not an essential of the general zoning plan, and is in its application to plaintiff's property so arbitrary and unreasonable as to be void. The decree is reversed and the case remanded, with directions to enter decree for plaintiff.

Reversed and remanded.